**HALL LABORATORIES, Inc. v. SPRINGS COTTON MILLS, Inc.**

**Civ. A. No. 1262.**

United States District Court
W. D. South Carolina, Rock Hill Division.

Feb. 27, 1953.

Roddey & Ward, Rock Hill, S. C., Blenko, Hoopes, Leonard & Buell, Pittsburgh, Pa., for plaintiff.

D. Reese Williams, A. Z. F. Wood, Lancaster, Davis, Hoxie & Faithfull, New York City, for defendant.

WYCHE, Chief Judge.

In compliance with Rule 52(a) of the Rules of Civil Procedure, I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

### Findings of Fact

1. This is a civil action for infringement of United States Patent 2,337,856, dated December 28, 1943 (hereinafter called "the Rice & Hatch patent"). The Rice & Hatch patent issued to plaintiff as assignee of Owen Rice and George B. Hatch and title has remained in plaintiff ever since.

2. The plaintiff, Hall Laboratories, Inc., is a Pennsylvania corporation. It is a wholly owned subsidiary of Hagan Corporation, a Pennsylvania corporation. Hagan Corporation is the parent corporation of two other wholly owned subsidiaries, The Buromin Company and Calgon, Inc., both Pennsylvania corporations.

3. The defendant The Springs Cotton Mills, Inc. is a South Carolina corporation, having places of business at Fort Mill, Grace and Kershaw, South Carolina, in the Western District of South Carolina.

4. The Rice & Hatch patent is for a process of retarding the corrosion of metal by water, and particularly for retarding the corrosion of pipe lines and other parts of water distribution systems. By "corrosion" is meant the formation of an oxide of the pipe metal (iron oxide, or rust, in the case of iron or steel pipe). It results from the presence of oxygen dissolved in the water, which oxygen reacts chemically with the metal when the water comes in contact with the pipe surface.

5. Corrosion manifests itself by the presence of suspended rust in the water— "red water"—or the formation of "tubercles" or growths of oxide inside the pipe.

6. The natural waters supplied by streams and wells are of almost infinite variety. The water supplies are corrosive over large areas of the United States and the problem of protecting water pipes is correspondingly widespread. In or prior to 1913, Baylis, a water chemist in Mississippi, proposed a protective system that was widely adopted. It consisted in adding chemicals to the water which would bring about a state of supersaturation of calcium carbonate therein; in such a situation calcium carbonate tends to come out of solution, not instantly but after a time lag, the length of time being dependent on various factors; the calcium carbonate accordingly deposits as a scale on the inside surfaces of the pipes and protects them from the corrosive action of the water.

7. In 1936, Professor Langelier of the University of California evolved a mathematical formula relating the various factors affecting the level of calcium carbonate saturation in waters treated according to the Baylis system, and water supplies have since been generally classified as having a positive, a zero, or a negative Langelier index or coefficient. If the index is positive the water is supersaturated and tends to deposit calcium carbonate scale; if the index is zero the water is saturated and tends neither to deposit nor to dissolve scale; if the index is negative the water is undersaturated and tends to dissolve calcium carbonate scale with which it comes in contact.

8. Although the Baylis system was widely used, it had several disadvantages: considerations of chemical costs limited its application to waters which naturally contain relatively large amounts of "bicarbonate radical," the cost being a factor of particular importance in those areas where the water systems serve textile plants, where lime (the cheapest of the usable chemicals) must be avoided because of its effect upon the goods; the carrying capacity of the pipes was materially reduced; the protection was not uniform through the system, an excess of scale forming near the treating plant, with resultant plugging troubles, and insufficient scale forming in the extremities of the system, with resultant corrosion troubles; and there was a notable tendency to plug up hot-water pipes and hot-water heaters.

9. Prior to the work of the patentees, Rice and Hatch, it was known that the tendency of waters that are naturally scale-forming (positive Langelier) to deposit scale could be retarded by the addition of small amounts, e. g., 1–10 parts per million, of a chemical called sodium metaphosphate

(herein called simply "metaphosphate"). It was and is desirable in certain situations to limit the deposition of scale; for example, scale reduces the efficiency of heat exchangers. However, if the water was corrosive as well as scale-forming, there was danger in using metaphosphate to control scale, because if the scale was not maintained thick enough to protect the metal surfaces from contact with the water, damage from corrosion resulted.

10. Metaphosphate is per se corrosive, and it is necessary to use rubber-lined, stainless steel pumps in handling concentrated solutions of it.

11. Rice and Hatch discoverd that the combination of negative Langelier water, calcium dissolved in the water, and metaphosphate dissolved in the water in amounts not exceeding two formula weights for each formula weight of dissolved calcium would form a submicroscopic protective film on metal surfaces with which the water was in contact, which film would protect the metal from corrosion by oxygen in the water. This is the discovery to which Rice & Hatch patent is addressed. If the water is positive Langelier the protective film will not form. If there is no calcium in the water the film will not form. If the metaphosphate addition exceeds two formula weights for each formula weight of calcium the film will not form, any film previously formed by observance of the 2:1 ratio will be dissolved, and corrosion will be accelerated.

12. The "formula weight" of a compound is the sum of the atomic weights of the atoms included in the formula.

13. The protective film appears to have a thickness of the order of a wave length of light. It is self-limiting in thickness, and cannot plug the pipes. It manifests itself by iridescence. It will form on metal or metal oxides but not on glass. It will protect rusty pipes as well as clean ones.

14. The maximum metaphosphate addition permitted by Rice and Hatch—two formula weights per formula weight of dissolved calcium—will protect the metal if the water is quiescent. If the water is moving, as in distribution systems, a lesser amount is required. The film is not permanent and the metaphosphate treatment must be continued to maintain it. Once formed, the protective film may be maintained in pipe systems by very small additions. Dosages as low as 1 to 2 parts per million are common.

15. The Rice and Hatch process has been and is widely used. It has been adopted by approximately 600 municipal water plants and 1,400 industrial water plants in the United States. It has been widely used in areas where the water serves textile mills.

16. Defendant owns and operates water plants at Fort Mill, Grace and Kershaw, South Carolina, in the western district of South Carolina. It draws raw water from the Catawba river for the plants at Fort Mill and Grace, and from Lynches Creek for the plant at Kershaw. The water is corrosive. The water is negative Langelier and contains calcium. Defendant adds metaphosphate in amounts ranging from 1 to 5 parts per million.

17. Defendant first practiced the metaphosphate treatment at Fort Mill, under the guidance of plaintiff's affiliate, Calgon, Inc., with metaphosphate purchased from Calgon, Inc. at a royalty-included price. It had been practicing the treatment at Fort Mill for some five or six years before it put the water plant at Grace into operation in 1948. Metaphosphate treatment was practiced at Grace from the beginning of operations there. The Kershaw plant went into operation in 1951. At first there was no metaphosphate treatment at Kershaw but after a few months' operation the treatment was adopted there. It has been continuously used in each of the three plants since its inauguration in them. Defendant now uses metaphosphate from another source and pays no royalty. Its current supplier is Rumford Chemical Works of Rumford, Rhode Island. Rumford is paying the cost of defending this action pursuant to an agreement to hold defendant harmless.

18. Defendant's practices, stated in the foregoing findings, effectively control corrosion in its water systems. The practices correspond to the requirements of the claims of the Rice & Hatch patent.

19. Defendant concedes that Rice and Hatch "were the first ones to publish the information" that when the requisite conditions specified in the Rice & Hatch patent are met, the described protective film is formed and that it "has some effects of retarding corrosion," but defendant contends that the requisite conditions were old in conjunction in the art. No specific instance of prior use was alleged. There is no evidence that the process had been used, wittingly or unwittingly, by anyone prior to Rice and Hatch.

20. The Rice and Hatch process is not disclosed in any of the patents relied on by defendant, namely: Hall & Jackson 1,903,-041; Hall Re. 19,719; Judson 1,924,861; Burk 2,063,788; Rosenstein 2,038,316; Fink & Richardson 2,358,222; Coslett 870,-937; Coslett 1,007,069; Allen 1,206,075; and Richards 1,069,903.

21. The differences between the Rice and Hatch process and the subject matter disclosed in any and all of the patents listed in Finding 20 are such that the Rice and Hatch process as a whole was not obvious in the light of them to a person having ordinary skill in the art at the time the Rice and Hatch invention was made.

22. If the water in a system contains calcium and is negative Langelier, the maximum metaphosphate dosage of two formula weights per formula weight of calcium will afford the desired protection. No experimentation is necessary in order to ascertain the invention or to make it work. Lesser dosages may be experimentally determined as a matter of economics, and men skilled in the art have no difficulty in ascertaining the economical dosage for particular conditions. It would have been impractical for the patentees to specify the most economical dosage for all possible combinations of circumstances.

23. Plaintiff and its affiliated companies adopted and have consistently followed a policy for the exploitation of the Rice & Hatch invention, which is as follows:

(a) Anyone desiring to use the patented process may do so upon the payment of a royalty at the uniform rate of two cents per pound (a lower rate was recently extended to the City of Philadelphia because of the very large amounts of metaphosphate involved).

(b) The user may purchase the metaphosphate wherever he chooses.

(c) If the user of the process elects to purchase metaphosphate from plaintiff or its affiliate, Calgon, Inc., the royalty is included in the price and the fact is stated on the package. If he elects to purchase from another source for use in the patented process, he is given a license agreement and pays the royalties thereunder.

(d) If the user of the process desires to purchase metaphosphate from the plaintiff or its affiliates for unpatented uses he pays the "ex royalty" price, which is two cents per pound less than the "royalty-included" price.

24. Neither plaintiff nor its affiliates sought, or seeks, to preclude defendant from purchasing metaphosphate from Rumford Chemical Works, or elsewhere, and defendant has not been impeded in electing and maintaining Rumford as its supplier. Plaintiff offered defendant a license at the same rate that it includes in its sales of metaphosphate for use under the patent, but defendant ignored the offer. The offer was repeated at the trial, and remains open.

## Conclusions of Law

1. This court has jurisdiction in the premises.

2. Plaintiff is and always has been the owner of the Rice & Hatch patent.

3. The Rice & Hatch patent discloses new and useful invention, meets all statutory requirements, and is valid.

4. Defendant has infringed the Rice & Hatch patent.

5. The manner of exploitation of the invention by plaintiff and its affiliated companies is proper and does not render the patent unenforceable.

6. Plaintiff is entitled to an injunction against further infringement, an award of damages for past infringements, and costs.

Counsel may submit appropriate order accordingly.