**APPLERA CORPORATION and Roche Molecular Systems, Inc., plaintiffs,**

v.

**MJ RESEARCH INC. and Michael and John Finney, defendants.**

**No. 3:98 CV 1201 JBA.**

United States District Court, D. Connecticut.

Dec. 22, 2004.

Goodwin, Chadbourne & Parke, New York, NY, Mary L. Azcuenaga, Wendy Schechter, Heller, Ehrman, White & McAuliffe LLP, Washington, DC, William J. Hone, Fish & Richardson, PC, New York, NY, Gwen P. Weisberg, Pullman & Comley, Hartford, CT, James Sicilian, Day, Berry & Howard, Hartford, CT, Jennifer K. Lawson, Testa, Hurwitz & Thibeault, Boston, MA, Mario R. Borelli, Robin L. Smith, Day, Berry & Howard, Hartford, CT, Edward R. Reines, Matthew D. Powers, Weil, Gotshal & Manges, Redwood Shores, CA, David J. Lender, Gianluca Morello, David Greenbaum, Weil, Gotshal & Manges, New York, NY, John Josef Molenda, Patrick J. Hoeffner, Sharon Yang, Rita Lynn Berardino, Orrick, Herrington & Sutcliffe, New York, NY, Paul Ehrlich, Weil, Gotshal & Manges, Redwood Shores, CA, for Plaintiffs.

A. Jason Mirabito, Brett N. Dorny, Geri L. Haight, Ivor R. Elrifi, John A. Harre, Joseph G. Blute, William A. Marino, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Albert L. Jacobs, Jr., Gerard F. Diebner, Joseph M. Manak, Greenberg Traurig, New York, NY, C. Allen Foster, David S. Panzer, Kevin E. Stern, Timothy C. Bass, Greenberg Traurig, LLP, Washington, DC, Christine Cora True–Frost, David A. Hoffman, John E. Beerbower, Latisha Thompson, Radu A. Lelutiu, Rudolf Koch, Cravath, Swaine & Moore, New York, NY, Daniel A. Ladow, Graham & James, New York, NY, Donna Nelson Heller, Finn Dixon & Herling, Stamford, CT, Harold Bolton Finn, III, Finn, Dixon & Herling, Stamford, CT, Joseph B. Darby, III, Greenberg & Traurig, Boston, MA, Mary Morabito Rosewater, Schulte, Roth & Zabel, New York, NY, Meghan A. Laganza, Patrick J. McHugh, Finn, Dixon & Herling, Stamford, CT, William C. Brashares, Mintz, Levin, Cohn,

Brian M. Poissant, Bruce J. Barker, Pennie & Edmonds, Charles W. Bradley, Jennifer Gordon, Joseph Evall, Robert A. Cote, Stephen J. Lieb, Orrick, Herrington & Sutcliffe, New York, NY, David Gersch, Asim Varma, Bertrand R. Lanciault, III, Jean C. Kalicki, Michael J. Klyce, Jr., Arnold & Porter, Washington, DC, James T. Shearin, Aimee Jennifer Wood, Pullman & Comley, Bridgeport, CT, Lawrence B.

Ferris, Glovsky & Popeo, Washington, DC, for Defendants.

**Rulings on Motion for Partial Summary Judgment on Patent Misuse of MJ Research, Inc. and Michael and John Finney ("MJ") [Doc. # 1028]; Plaintiffs' Cross Motion for Partial Summary Judgment on MJ's Patent Misuse Defense [Doc. # 1087]**

ARTERTON, District Judge.

The Court assumes familiarity with the facts of this case from prior rulings. Defendants MJ Research, Inc. and Michael and John Finney (collectively "MJ") have moved for partial summary judgment on their patent misuse defense, arguing that the per-cycler licensing fee imposed under Applera's Supplier Authorization Program ("SAP") impermissibly imposes a tax on staple items of commerce. Plaintiffs Applera Corporation ("Applera") and Roche Molecular Systems ("Roche") have cross-moved for summary judgment and assert that the SAP is within the scope of Applera's patent grant. The parties' core arguments have been addressed in prior rulings;[1] the remaining arguments are evaluated below.

Applera's '188 patent (U.S. Patent No. 4,965,188) covers the performance of PCR on a thermal cycler.[2] Through its SAP, Applera licenses the right to perform PCR on a thermal cycler by charging an upfront royalty on the sales of thermal cyclers sold by thermal cycler suppliers, after which the thermal cycler is referred to as "authorized" for use in performing PCR without infringing Applera's PCR process patents, and suppliers are thereby immunized from liability for inducing infringement of the process patents. According to MJ, the SAP's per-cycler license fee constitutes patent misuse, because Applera's PCR process patents "give plaintiffs no rights to derive revenue from sales of staple products, even where used during the performance of PCR." Defendants' Memorandum in Support of their Motion for Partial Summary Judgment on Patent Misuse [Doc. # 1029] at 1. Applera contends that the per-cycler license fee is reasonably within the scope of its patent grant, and that the SAP licenses are immune from a misuse finding under 35 U.S.C. § 271(d)(1) and (2).

◼ "Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed.Cir.1997)

1. *See* Ruling on Motion of MJ Research, Inc. for Summary Judgment Determining that Plaintiffs' Licensing Scheme Imposes a Total Sales Royalty and Applera's Cross Motion for Summary Judgment Seeking a Determination that Applera's Licensing Program does not Impose an Improper Total Sales Royalty and Thus is Not Patent Misuse [Doc. # 1253]. Ruling on Motion for Summary Judgment of MJ Research, Inc. in Its Favor on The Claims of Monopolization, Attempted Monopolization and Conspiracy to Monopolize and on Applera's Cross Motion for Summary Judgment on MJ Research, Inc.'s Claims on Monopolization, Attempted Monopolization, and Conspiracy to Monopolize [Doc. # 1254]; Ruling on

Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 874].

2. Applera's '188 patent (U.S. Patent No. 4,965,188) covers "the performance of PCR using a thermostable enzyme, in which the heating and cooling steps required by PCR ... are automated by a machine that controls temperature levels, transitions from one temperature to another, and the timing of the temperature levels." Joint Stipulation Regarding Claim Construction of the '202, '195, and '188 Patents [Doc. # 640] at ¶ 4.

(citations and internal quotation marks omitted).[3] A licensing practice is "reasonably within the patent grant" if "it relates to subject matter within the scope of the patent claims." *See Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 708 (Fed.Cir. 1992). If, on the other hand, a licensing practice "has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the 'rule of reason.' Under the rule of reason, the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Virginia Panel,* 133 F.3d at 869 (citations and internal quotation marks omitted).

To prove its claim that the SAP exceeds the scope of Applera's patent, MJ first seeks to diminish the impact of the jury's finding that it induced infringement of Applera's PCR process patents, arguing that the SAP's "authorization" requirement itself created the possibility of inducement where none previously existed. Next, MJ argues that the SAP licenses more than the conduct that would otherwise induce infringement, because the SAP imposes a fee on the mere sale of thermal cyclers. As MJ notes, the mere sale of the cyclers would not constitute infringement of Applera's process patents, because thermal cyclers have been found to be staple

items of commerce. Instead, MJ compares the licensing of thermal cyclers to the licensing of lab coats or test tubes, items which are also used in the performance of the PCR process but the sales of which are not infringing and may not be licensed as part of a PCR process patent grant. Further, MJ challenges Applera's characterization of the per-cycler license fee in the SAP as an "upfront fee" for the performance of PCR, arguing that the "fee is not imposed on the user for the initial right to perform PCR, but with respect to the purchase of each thermal cycler, requiring that the supposed 'upfront fee' to perform PCR be paid repeatedly as a user migrates to newer and better thermal cyclers." Reply Memorandum of MJ Research, Inc. ("MJ") in Support of Partial Summary Judgment in favor of MJ and Michael and John Finney on the Patent Misuse Defense and in Opposition to Plaintiffs' Cross–Motion [Doc. # 1113] at 3. MJ also disputes Applera's characterization of the per-cycler license fee as a "measure" or "meter" of PCR performance, arguing that the sales of a thermal cycler has no direct correlation to the amount of PCR performed on it.

■ The Court finds MJ's arguments unpersuasive, and concludes that, as a matter of law, Applera's licensing program does not exceed the scope of its patent grant. The jury's determination that MJ induced infringement of Applera's PCR process patents was based on its evaluation of MJ's conduct in light of Applera's *patent,* not Applera's licensing program.

3. The licensing practices that constitute per se patent misuse have been addressed in prior rulings. *See supra* n. 1. In particular, as discussed in this Court's monopolization decision, MJ's argument that Applera's licensing program constitutes per se patent misuse under the line of Supreme Court authority represented by *Carbice Corp. of Am. v. Am. Patents Dev. Corp.,* 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931), *Leitch Mfg. Co. v. Barber Co.,* 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938), and *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), is unavailing because the SAP was not a tie and did not extend Applera's "control over the supply of unpatented material." *Carbice,* 283 U.S. at 33, 51 S.Ct. 334.

As the parties agree, claim 9 of the '188 patent, defined as "the performance of PCR using a thermostable enzyme, in which the heating and cooling steps required by PCR ... are automated by a machine that controls temperature levels, transitions from one temperature to another, and the timing of the temperature levels," covers the use of a thermal cycler to perform PCR. MJ's assertion that thermal cyclers are analogous to lab coats and test tubes thus ignores the obvious—Applera has patented automated PCR, which covers PCR performance on thermal cyclers, and neither the patent nor the licensing scheme relates to generic laboratory appurtenances. While MJ faults Applera's sudden change in its licensing requirements in instituting the SAP in 1994, after earlier licensing only the reagents used in the PCR process, Applera's license program did not create MJ's liability for inducing infringement.[4] It was MJ's conduct, particularly its promotion of using the unauthorized thermal cyclers it sold to perform PCR, that gave rise to MJ's infringement liability.

The induced infringement of Applera's process patents which has been found means that MJ needed Applera's permission to engage in its otherwise infringing activities. The SAP that Applera had proposed, which charged a royalty of $300–$400 for each thermal cycler sold, provided a means of measuring the scope of MJ's infringing activities. MJ correctly notes that the sales of thermal cyclers would not measure the amount of PCR performed. Thermal cycler sales, however, would relate to the degree to which MJ promoted PCR use. Applera presented evidence at trial that MJ optimized its thermal cyclers for PCR, pre-programmed its thermal cyclers for the performance of PCR (prior to 2001), advertised and promoted its thermal cyclers for PCR, advised its customers in implementing PCR on its thermal cyclers, and attributed the success of its thermal cycler business to PCR. Applera's evidence also showed that vast majority of MJ's customers used their thermal cyclers for PCR in Applera's fields,[5] and few of MJ's customers had any independent end user license to practice PCR on their thermal cyclers. The degree to which MJ was engaged in the activities constituting inducement of infringement, including PCR optimization, advertising, and technical assistance, thus depended at least in part on the number of thermal cyclers sold.[6] Because MJ's inducing activities related to the sale of thermal cyclers, the per-cycler licenses fee did not impermissibly broaden the scope of Applera's patent. *See Mallinckrodt*, 976 F.2d at 708 (a licensing practice is "reasonably within the patent grant" if "it relates to subject matter within the scope of the patent claims").[7]

4. A license represents merely the patent holder's permission to engage in otherwise infringing activities, and the patent holder is given considerable flexibility in choosing whether or how to license.

5. Plaintiffs' expert testified that his study showed that 95.75% of all MJ thermal cyclers in the United States have been used to perform PCR in an Applera field. *See* Trial Transcript of Dr. Gerald Ford [Doc. # 1108] at 2198–2199.

6. MJ's argument that there was not a one-to-one ratio between the number of thermal cy-

clers sold and the number of thermal cyclers used to perform PCR in Applera's fields (and thereby infringe Applera's patents) is addressed in this Court's total sales royalty decision.

7. For the same reasons, Applera's End User Authorization program ("EAP") did not exceed the scope of Applera's patent. MJ argues that the need for suppliers to pay for the right to promote their thermal cyclers for PCR and other inducing activities would not justify or excuse the "authorization" requirement imposed on the end user. However, under the EAP only end users who would

The Federal Circuit has approved a licensing arrangement similar to that at issue here, holding that "royalties may be based on unpatented components if that provides a convenient means for measuring the value of the license." *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1407–08 (Fed.Cir.1996) (approving a licensing program for a patented process for connecting the ends of sheet metal duct sections using corner connectors, which based the royalty on the sales of the corner connectors, even though the corner connectors were "staple articles of commerce."). The Federal Circuit rejected the licensee's argument that it was coerced into accepting the terms of the license, and found:

> Although the record in the instant case indicates that Met–Coil aggressively enforced its rights under the '641 patent, there is nothing per se illegal about doing that. Further, it appears from the record that Engel voluntarily agreed to the royalties provisions, at least initially. Met–Coil was doing nothing more than what the '641 patent gave it a statutory right to do, and Engel predictably was not excited to relinquish profit to its competitor. Nothing is unusual about this scenario. We do not, therefore, find support for Engel's assertion that Met–Coil used its market power to shoehorn Engel into a license agreement that forced Engel to purchase unpatented items from Met–Coil.

> .   .   .   .   .

> The corners that Engel produced or had produced for use in its TDF system were certainly suited for their intended use, and Engel unquestionably desired them. The only corners that Engel did not desire or that were unsuited for its use were those manufactured by Met–Coil. The license agreement, however, was not conditioned on the purchase of corners from Met–Coil. It gave Engel the option to purchase its corners from Met–Coil, but Engel, in fact, never did so.

*Engel,* 96 F.3d at 1408–09.

Although the Federal Circuit recognized Engel's voluntary participation in the license agreement, in reliance on the test for an improper total sales royalty set forth in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 138, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969),[8] it also made clear that the patent holder is given considerable latitude in independently determining what is a convenient measure of the value of the license. As *Engel* in-

---

otherwise be directly infringing Applera's process patent by performing PCR on an unauthorized thermal cycler would need a license. Thus the two licensing methods do not overlap.

8. The parties separately moved for summary judgment on MJ's total sales royalty claim, which the Court has addressed in a prior ruling. *See supra* n. 1. The licensing situation addressed in *Engel* is analytically distinct from a total sales royalty of the kind at issue in *Zenith Radio*. In *Zenith Radio,* the patent holder required radio or television manufacturers to pay royalties for a package of patent rights based upon the licensee's total radio and television sales, whether or not they used patented technology. In *Engel,* in contrast, the issue was whether staple items of commerce that *were* used in a patented process could be used as a measure of the value of the license. Because in *Zenith Radio* at least some products on which the license fee was based did not relate to the subject matter of the patent, the Supreme Court found that "conditioning" the license on the acceptance of a total sale royalty would constitute patent misuse, but acknowledged that total sales royalty arrangements were not per se invalid because they may serve the convenience of the parties. The Federal Circuit in *Engel* found *Zenith Radio*'s "conditioning" prohibition to be inapposite, because the corner connectors were used in the patented process.

structs, in the absence of a tie or a coercive total sales royalty, a patent holder who bases royalties for a patented process on the staple items of commerce used in the process is "doing nothing more than what the [ ] patent [gives] it a statutory right to do." *Engel,* 96 F.3d at 1408. *See also Hall Laboratories, Inc. v. Springs Cotton Mills, Inc.,* 112 F.Supp. 29, 32 (W.D.S.C.), aff'd 208 F.2d 500 (4th Cir. 1953) (approving of royalty for patented process of retarding water corrosion of metal using the chemical metaphosphate that was based on amount of metaphosphate, even though metaphospate had uses other than the patented process). Under the Federal Circuit's patent misuse standard, courts will not second guess the patent holder's royalty mechanism so long as it "relates to" the subject matter of the patent grant, *Mallinckrodt,* 976 F.2d at 708, and does not extend the patent holder's control over the unpatented materials.

This conclusion also finds support in the fact that, in awarding patent infringement damages, courts have calculated a reasonable royalty based on the sales of staple items of commerce. In *Mickowski v. Visi–Trak Corp.,* 36 F.Supp.2d 171 (S.D.N.Y. 1999), for example, the district court found that Visi–Trak, a company that manufactured a computer monitoring and analysis system for the die casting industry, induced infringement of plaintiffs' patents where the "sales literature and software manual provided by Visi–Trak for this computer monitoring system demonstrate how the monitoring system may be used to practice the monitoring methods" claimed in the patent, even though "the Visi–Trak computer monitoring system may be used to practice monitoring methods other than the methods taught by [the patent]." *Id.*

at 181. The court found "a reasonable royalty to be 20% of the gross sales of the Visi–Trak monitoring system." *Id.* MJ has not identified any authority supporting its view that such a royalty mechanism constitutes patent misuse.[9]

MJ also challenges the per-cycler fee on grounds that such a license is not transferable, so that an end user purchasing multiple thermal cyclers would pay multiple times for a license to use thermal cyclers to perform PCR. Relying on *PSC Inc. v. Symbol Technologies, Inc.,* 26 F.Supp.2d 505 (W.D.N.Y.1998), MJ argues that the collection of multiple royalties for the same product violates the exhaustion doctrine and impermissibly extends the scope of the patent grant. In *PSC,* however, the patent holder collected royalties from two licensees for the same product. Here, in contrast, there is only a single upfront license fee charged on each thermal cycler. That thermal cycler would remain "authorized" for PCR use regardless of the number of persons using the machine over time, and end users would not need to obtain separate licenses to use the machine for PCR. Such a licensing arrangement does not run afoul of the exhaustion doctrine.

For the foregoing reasons, Motion for Partial Summary Judgment on Patent Misuse of MJ Research, Inc. and Michael and John Finney ("MJ") [Doc. # 1028] is DENIED, and Applera's Cross Motion for Partial Summary Judgment on MJ's Patent Misuse Defense [Doc. # 1087] is GRANTED.

IT IS SO ORDERED.

---

9. In light of the conclusion that Applera's licensing program is within the scope of its patent grant, the Court does not address Appl-

era's argument that it is statutorily immune from a misuse finding under 35 *U.S.C.* § 271(d)(1) and (2).