41 C.C.P.A.(Patents)
### Application of SUTTON et al.
### Patent Appeals No. 6004.

United States Court of Customs and Patent Appeals.
March 23, 1954.

Worley, J., dissented in part.

Cushman, Darby & Cushman, and William M. Cushman, Washington, D. C. (Andrew R. Klein, Philadelphia, Pa., of counsel), for appellants.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

JOHNSON, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the action of the Primary Examiner in finally rejecting claims 21 to 40, inclusive, which are all of the claims of appellants' application, Serial No. 54,363, for a patent on "Improvements in the Coloration of Cellulose Acetate." All of the appealed claims are process claims and no claims have been allowed.

Claims 23, 24, 28, 29, 33, 34, and 36–40, inclusive, have been rejected as drawn to nonelected species of appellants' alleged invention. There is no controversy over this rejection. Those claims will not be considered on their merits by this court. In re Jones, 162 F.2d 638, 34 C.C.P.A., Patents, 1168; In re Kirwan, 171 F.2d 326, 36 C.C.P.A., Patents, 772.

The claims rejected by the Patent Office as unpatentable over the prior art fall into three distinct categories. Claims 25, 26, and 35 are considered by us to be representative of these categories. These claims read as follows:

"25. Process for the coloration of textile material comprising cellulose acetate which process includes the step of contacting the material with a mixture consisting essentially of a vat dyestuff, a sulphoxylic reducing agent, and an alkaline pH regulator of insufficient alkalinity to cause substantial saponification of cellulose acetate under the conditions of the process, subjecting the material to temperatures of the order of 90°C.–100°C., and oxidizing the dye-

stuff, said process being characterized in the omission of addition agents having a pronounced swelling effect on cellulose acetate.

"26. Process for dyeing textile material comprising cellulose acetate which process includes the steps of immersing the material in a dyebath consisting essentially of water, a vat dyestuff, and a sulphoxylic reducing agent, at temperatures of the order of 90°C.–100°C., and for from 10 to 15 minutes, and subsequently oxidizing the dyestuff.

"35. Process for dyeing textile material comprising cellulose acetate which process includes the steps of mechanically impregnating the material with a liquor containing a vat dyestuff and a sulphoxylic agent, steaming the impregnated material under pressure, and then giving it an oxidizing treatment."

The rest of the claims to be considered on their merits are similar to one of the above claims. Claim 21 is similar to claim 25, differing therefrom in that it does not set out the pH regulator nor the omission of swelling agents, although it does state that there will be no addition of agents capable of affecting substantial saponification of the cellulose acetate. Claim 21 also specifies air oxidizing. Claim 31 is very similar to claim 35, except that it adds a drying step before the steaming step, and it does not require that the steaming be done under pressure. Claim 22 depends on claim 21, claim 27 depends on claim 26 and claim 32 depends on claim 31, each of the dependent claims adding to the parent claim that the sulphoxylic reducing agent used in sodium formaldehyde sulphoxylate. Claim 30 depends on claim 26 and adds that the dye bath also contains an alkaline pH regulator that will not cause substantial saponification of the cellulose acetate.

The reference relied on is: Scull 2,-424,857, July 29, 1947.

As is apparent from the above quoted claims, appellants' alleged invention is for a process for dyeing or coloring a textile material that is wholly or partly of cellulose acetate, with vat dyestuffs. To insure an understanding of appellants' process and the reference patent we believe that some discussion of vat dyes will be helpful. As shown by the record, the use of vat dyes is desired because they are very fast, resisting fading from both light and extensive washing. However, vat dyes are insoluble and thus cannot be used directly. To use them it is first necessary to reduce them to their colorless or leuco form, in which form they are soluble in an alkaline solution and can be adsorbed by various types of material. There are two common methods used in applying vat dyes to the desired material. In one method the leuco form of the dye is mixed in an alkaline solution and the material is immersed in this solution to adsorb the leuco form of the dye. Then the material is removed and subjected to an oxidizing action which converts the leuco form in the material back to the insoluble dye. An alternate method is to form a dye bath of a suspension of the unreduced vat dye and an alkaline reducing agent that is inactive below a certain temperature. The material to be dyed is placed in the dye bath and then, with or without passing through rollers to remove some of the excess suspension, it is passed through a drying step to remove the volatile. It is then placed in a steam chamber where the reducing agent is activated and the dyestuff reduced to its leuco form and adsorbed by the material. Then the material is subjected to an oxidizing treatment to convert the leuco form in the material back to the insoluble dye. These methods are apparently used to dye textile material composed of cotton or regenerated cellulose. However, they have not been satisfactory for the dyeing of material composed of cellulose acetate because of excessive saponification of that material by the alkaline baths. This saponification destroys some of the desirable characteristics of the cellulose acetate, in effect, changing it to regenerated cellulose or

viscose. The dyeing art has sought for some method of applying these dyes to cellulose acetate without destroying its desirable properties. This is the problem to which appellants' application is directed as is the patent to Scull, cited by the Patent Office.

Appellants' process is for the coloration of a textile material with the vat dyes. The textile material can be wholly cellulose acetate or it can be a combination of some other material and a percentage of cellulose acetate. The process requires that the material be contacted with a dyebath that consists of a vat dyestuff, a sulphoxylic reducing agent and water, and it may contain an alkaline pH regulator. At some stage of the process, either while being contacted with the dyebath (claim 26) or after having contacted the dyebath, the material is subjected to temperatures of the order of 90°C.–100°C. The material is then given an oxidizing treatment to oxidize the dyestuff. The specification states that this process is carried out with little or no saponification of the cellulose material, but this limitation is only included in three of the claims (claims 21, 25, and 30) in terms of lack of "substantial saponification" under the conditions of the process.

.. The patent to Scull is for a "Process for Dyeing Textile Materials comprising a Cellulose Carboxylic Ester with Vat Dyes." This patent discloses a process for dyeing a material containing cellulose acetate in any percentage from 1 to 100 percent with a vat dye without "altering the physical characteristics of the original fibers of the textile material." It is also disclosed that dyeing by this process maintains "the characteristic feel and hand of the original goods." In the Scull process the cellulose acetate material is padded with a mixture comprising a vat dye in its unreduced form, a stable alkaline reducing agent, an alkaline agent and a thickening agent. The material is padded with this mixture, then dried without smearing the dye mixture. Then the material is "aged," that is, treated with steam until the vat dye is substantially reduced and the sur-

face of the fibers of the cellulose acetate is saponified to a greater or lesser degree. As Scull states, col. 3, ll. 15–22:

"The saponification obtained in this manner is not to be confused with the saponification which occurs in an alkaline vat. The saponification which obtains in practicing my invention is a surface saponification which, I have found, is essential in order to obtain dyeings with anthraquinone vat dyes."

After "aging" the material is treated with an oxidizing agent for the reduced vat dye to convert the dye to its insoluble form. The patentee discloses that the temperature used in the "aging" step is from 212°F.–270°F. (100°C.–133°C.) and the time from 3½ to 4 minutes. In the example given in Scull's specification sodium carbonate is disclosed as the alkaline agent and formaldehyde sodium sulfoxylate as the reducing agent. In all of the patentee's claims the use of the alkaline agent is "to convert the reduced anthraquinone vat dye to its salt form and to cause surface saponification of a small fraction of the depth of the ester fibers." It is also disclosed that one of the earlier proposals in dyeing cellulose acetate with vat dyes was to treat the material with the dyes in a vat of such low alkalinity that the cellulose acetate was not saponified. The patentee states that this method was of no utility whatsoever for anthraquinone dyes.

All of appellants' claims considered on their merits, were rejected as unpatentable over the process disclosed by Scull. The examiner held that there was no distinction between the fractional saponification of Scull and the insubstantial saponification of appellants' claims. It was further held by the examiner that Scull taught the possibility of using little or no alkali with certain types of vat dyestuffs, and since the claims did not exclude these dyes they were fully anticipated by the patentee. With regard to the claim of steaming under pressure, the examiner noted that Scull disclosed the use of steam up to 270°F. (133°C.), which is steam under pressure. The Board of Appeals of the United States

Patent Office affirmed the rejection on Scull. With respect to claim 26, supra, the board stated (R-64, 65):

"With Scull's teaching concerning the limitation of saponification to a minor degree of surface saponification, we do not think the restriction to immersion dyeing is significant."

In its opinion the board also held that the sodium carbonate of Scull's composition is an alkaline pH regulator.

Appellants assign as error the board's holding that sodium carbonate is an alkaline pH regulator; the board's failing to hold that "consisting essentially" does distinguish over the reference cited and the board's holding that the exclusion of "substantial saponification" does not distinguish over the limited saponification of the reference, as well as numerous other assignments, all of which are argued in their brief.

With respect to sodium carbonate and sodium sulfite as pH regulators, the following is cited from Hackh's Chemical Dictionary, Third Edition (1950 printing with changes and additions):

"Sodium Carbonate. Soda, washing soda." (p. 780.)

"Sodium Sulphites. (1) $Na_2SO_3$ * * * used as a reagent or a reducing agent." (p. 784.)

"Regulator. * * * (2) a substance used in flotation for pH control; as *soda*, lime, sulfuric acid." (Italics supplied.) (p. 732.)

From the above we think it obvious that sodium carbonate is used as a regulator for pH control. Therefore, the board was not in error in holding that sodium carbonate is a pH regulator.

We will now consider the rejection of the various claims, rejected on their merits, according to the three categories set out, supra. Claims 21, 22, and 25 set out a process which includes the following steps in the coloration of a textile material comprising cellulose acetate:

1. Contacting the material with a mixture consisting essentially of a vat dyestuff and a sulphoxylic reducing agent.

2. Subjecting the material to temperatures of 90°C. to 100°C.

3. Oxidizing the dyestuff.

The claims also state the omission of agents capable of effecting substantial saponification under the conditions of the process. Scull's process for coloring a textile material comprising cellulose acetate includes the following steps:

1. Padding a textile material with a mixture comprising a vat dye, an alkaline reducing agent (sodium formaldehyde sulfoxylate is an example given by Scull) an alkaline agent and a thickening agent.

2. Drying the material.

3. Steaming the material with steam of 212°F. to 270°F. (100°C. to 133°C.)

4. Oxidizing the dye.

The patentee also states that the process will only "cause surface saponification of a small fraction of the depth of the ester [cellulose acetate] fibers."

From the above it would seem that the steps of appellants and Scull are very similar. If the drying step were excluded there would be no distinction between the process unless it could be said that the addition agents of Scull are capable of substantial saponification under the conditions of the process. However, as we have pointed out, Scull excludes saponification of more than a fraction of the depth of the cellulose acetate fibers under the conditions of his process. We do not believe that the omission from the dyebath of an agent capable of effecting substantial saponification sufficiently points out any patentable distinction over Scull's process, which is limited to fractional saponification. The term "consisting essentially" does not exclude the use of a pH regulator since a pH regulator is included in claim 25 which has the same term and is also included in claim 30 which depends from claim 26 under the same term. Therefore, since sodium carbonate is a pH regulator it is not excluded from the claims by the term "consisting

essentially," nor is the thickening agent since appellants admit that the term is "broad enough to include the presence of other materials which do not affect the basic * * * character of the composition claimed or of its behavior in use, * * * ." We are in complete agreement with this definition, and it is obvious that a thickening agent will not affect the basic character of the dyebath.

The word "substantial" does not, in our opinion, define any definite degree of saponification which would necessarily be less than that allowed by the Scull process. In re Lautenschlaeger, 136 F.2d 739, 30 C.C.P.A., Patents, 1193. See, also, In re Teter, 158 F.2d 1007, 34 C.C.P.A., Patents, 797. It is noted that appellants do not claim that no saponification occurs under the condition of the process but only that no substantial saponification occurs. The limitation to air-oxidizing in claim 21 is not considered as a patentable distinction over the Scull process since air-oxidizing is considered as the equivalent of the chemical oxidizing of Scull. Appellants disclose both of these methods of oxidizing in their application and use each in various of their examples. This should clearly indicate that they are equivalents. In re Lobdell, 167 F.2d 634, 35 C.C.P.A., Patents, 1091. The specific use of sodium formaldehyde sulphoxylate as the reducing agent in claim 22 cannot lend patentability to that claim since Scull discloses the use of the same material (spelled "sulfoxylate" by the patentee) as a reducing agent. See In re Lobdell, supra. The omission of swelling agents from claim 25 does not distinguish over Scull since such agents are not included in any of Scull's claims, thus to omit them would be to follow the patentee's teaching, which could not be considered as invention. In re Lieser, 162 F.2d 224, 34 C.C.P.A., Patents, 1113; In re Teter, supra. The fact that the drying step is not specifically set out in the process claimed does not exclude it since the claims are not drawn such that they cannot include other steps in the process. Further, appellants include the drying step in about half of their examples, indicating that drying is apparently a matter of choice in the process.

■ From the above we conclude that the rejection of claims 21, 22, and 25 as failing to define invention over the process of Scull is proper and will be affirmed.

Claims 31, 32, and 35 include the following steps in the process of dyeing a textile material comprising cellulose acetate:

1. Mechanically impregnating the material with a liquor consisting essentially of a vat dyestuff and a sulphoxylic reducing agent.

2. Drying the material.

3. Steaming the material.

4. Oxidizing the dyestuff.

Claim 35 does not specifically include the drying step and adds the requirement that the steaming be done under pressure. Scull's process steps are as set out, supra.

Claims 31 and 32 appear to be fully met by the Scull process. The only possible distinction would be the requirement that the liquor "consist essentially" of the dyestuff and the sulphoxylic reducing agent. However, as we have pointed out before, the term does not exclude the presence of other materials which do not affect the basic character of the claimed composition or of its behavior in use. One such material would be an alkaline pH regulator that would not cause substantial saponification of the cellulose acetate. Scull's sodium carbonate is of the class of alkaline pH regulators and will not cause substantial saponification of the cellulose acetate under the conditions of his process. Claim 35 adds the limitation of steaming under pressure. This limitation is found in Scull since he specifies steam at 212°F. to 270°F. We think it is common knowledge that steam above a temperature of 212°F. (100°C.) is above atmospheric pressure and is, therefore, steam under pressure. Mark's Mechanical Engineers Handbook, 5th Ed. (1951) lists a pressure of 42 psi for steam at 270°F. (atmospheric pressure

is approximately 14.7 psi). Therefore, Scull discloses the use of steam under pressure and appellants are merely following this teaching.

In view of the above, we are of the opinion that claims 31, 32, and 35 were properly rejected on the Scull reference and such rejection must be affirmed.

Claims 26, 27, and 30 are limited to a process of immersion dyeing for a textile fabric comprising cellulose acetate, which process includes the following steps:

1. Immersing the material in a dyebath consisting essentially of water, a vat dyestuff and a sulphoxylic reducing agent at temperatures of 90°C. to 100°C. for 10 to 15 minutes.

2. Oxidizing the dyestuff.

The reference to immersion dyeing relied on by the examiner and discussed in the Patent Office brief is the following from the Scull patent:

"Another early proposal was to treat the textile materials with vat dyes in a vat of such low alkalinity that the cellulose ester was not saponified, the vat containing a protective colloid such as gelatin or starch and a water soluble salt, such as calcium chloride or sodium chloride. Likewise, this proposal, while possibly suitable for vat dyes of a simple character, is of no utility whatsoever for the high molecular weight complex anthraquinone vat dyes."

This does not, in our view, anticipate the specific process claimed by appellants. There is no disclosure of the use of a sulphoxylic reducing agent nor of the temperatures and time required by the claims. Scull's own disclosure does list the use of a sulphoxylic reducing agent but he limits the time of steaming (where the reduction of the vat dye to its leuco form and the fractional saponification occurs) to from 3½ to 4 minutes. He also states that "[g]reater saponification can be obtained by extend-

ing the time of the steaming operation." It would follow that to get less saponification one would reduce the time that the cellulose acetate material is exposed to the high temperature during the reduction of the vat dye. Appellants' claims, directed toward increasing this time, are directly opposed to the prior art teaching. Therefore, we are of the opinion that these claims patentably distinguish over the reference cited against them and accordingly, their rejection will not be sustained.

We have carefully studied the briefs filed by both parties, and have carefully considered all of the arguments contained therein. In the view we have taken we do not deem it necessary to discuss them further. For the reasons hereinbefore stated, the decision of the Board is *modified*, the rejection of claims 21, 22, 25, 31, 32, and 35 is *affirmed* and the rejection of claims 26, 27, and 30 is *reversed*.

Modified.

WORLEY, J., dissents as to the reversal of the rejection of claims 26, 27, and 30.