GENERAL FOODS CORP., Plaintiff,

v.

PERK FOODS COMPANY, Defendant.

No. 64 C 1829.

United States District Court
N. D. Illinois, E. D.

Feb. 13, 1968.

Arthur Connolly, Connolly, Bove & Lodge, Wilmington, Del., Phillip Bowman, Miller, Gorham Wescott & Adams, Chicago, Ill., Michael J. Quillinan, White Plains, N. Y., for plaintiff.

Herman Gordon and Ernest Cheslow, Dressler, Goldsmith, Clement & Gordon, Chicago, Ill., for defendant.

MEMORANDUM OPINION

MAROVITZ, District Judge.

FINDINGS OF FACT

1. This action is for infringement of U. S. Letters Patent No. 3,119,691, which is entitled, "Novel Farinaceous Animal Food." It is resisted by a counterclaim alleging non-infringement and invalidity. The patent was issued to plaintiff, General Foods Corporation (hereinafter known as General Foods) on January 28, 1964, identifying Varnum D. Ludington, Robert E. Schara, and Raymond E. Mohlie, as patentees, who assigned the patent to plaintiff. The application for the patent was filed April 23, 1962.

2. Plaintiff, General Foods, is a Delaware corporation with its principal place of business in White Plains, New York. It is the owner of the patent in suit, and makes and sells various food products, including a rehydratable dry dog food called "Gravy Train," which it alleges is manufactured in accordance with the teachings and claims of the patent in suit.

3. Defendant, Perk Foods Company (hereinafter referred to as "Perk"), is an Illinois corporation with its principal place of business in Chicago, Illinois.

4. Defendant is alleged to infringe process claims 1, 4, and 6, and "product-by-process" claims 12 and 13 of the patent in suit, by reason of the manufacture and sale of its dog food product known as "Vets' Gravy Style."

5. The trial was extensive, commencing on May 22, 1967, and concluding on June 9, 1967. The transcript of the record comprises over 1,700 pages and there were over 150 exhibits introduced, many of them consisting of numerous pages. An important aspect of the evidence consisted of demonstrations during the trial observed by the Court, as well as physical exhibits of representative dog foods.

6. The testimony having been concerned with technical matters and in many instances conflicting, the following findings are a result of careful consideration of the most credible evidence, both testimonial and documentary, and an evaluation of the courtroom demonstrations and physical exhibits. The findings are in some measure predicated upon an observation of the witnesses and a consideration of their demeanor, competency, and credibility, and many of the findings contained herein are adopted from those submitted by the respective parties.

7. Any Finding of Fact entered herein which may be properly considered in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law herein.

*Background Reference*

8. Prior to 1955, the major prepared dog foods were canned dog foods and dry cereal-like "meals," primarily of the small pellet type. The canned products, varieties of which were sold by defendant, had a meat-like texture and a moisture content of about 75%. They had a high degree of palatability but, after the can was opened, they had poor storage characteristics. The meal types extant at that time were characterized by a cereal-like texture, a moisture content of about 10%, and a small particle size. (Stip. 8–9)

9. Plaintiff was the largest seller of "meal" type dog food with its "Gaines Meal" product, which was a homogenized product in the form of small pellets about ¼ inch across. "Gaines Meal" was sometimes served by the dog owner with added water. In some cases, dog owners added other materials to "Gaines Meal," including table scraps and table gravy. When moistened, the meal product tended to become mushy or doughy, and stick to the feeding plate. Reports of consumers' addition of table gravy to "Gaines Meal" were transmitted to plaintiff's management prior to 1959. (Stip. 9–10)

10. By 1957, the Ralston-Purina Company had introduced a new type of nutritionally balanced dry dog food into the national market, under the name "Purina Dog Chow." Dog Chow differed from the earlier "meals" in that; (1)

it had a larger particle size, (2) it was a light, expanded, porous particle, or "kib," and (3) the kibs had fat on their exterior surfaces. (Stip. 11–12; Mohlie dep., DX–121K, p. 212–13; Bloomquist dep., DX–121E, p. 134–35)

11. Purina Dog Chow was usually served to dogs with water added, and the directions on the package instructed users to add moisture before serving the product, specifying one cup of water to six cups of product. (DX–106B)

12. Although it was thought that moistening helped increase the palatability of the dry dog foods, the addition of large amounts of water to Dog Chow caused mushiness or stickiness, which generally was less palatable to dogs than the recipe specified on the package. (Mohlie Tr. 34, Kinslie Tr. 872)

13. Purina Dog Chow was immediately successful in the marketplace, and the Gaines Meal share of the dry dog food market dropped substantially. Dog Chow today is the top selling dry dog food, ahead of both Gaines Meal and "Gravy Train." (Stip. 11; DX–30)

14. In 1958, plaintiff instituted an extensive program to develop a dog food which would have competitive distinctions over the products then available, and particularly Purina Dog Chow. A "crash program" to develop such a product was begun in view of the success of Purina Dog Chow and the consequent decrease in Gaines Meals sales. (Stip. 14). At the outset of their research, General Foods' researchers reviewed their accumulated knowledge and experience on all factors which contributed to the appeal of a dog food. They thought they knew from their experience in this field that dogs preferred a larger particle size; that added fat increased palatability; and that the ability of a dog food to absorb large amounts of water enhanced its palatability, but that this factor was defeated by the tendency of water to convert the dog food to a mushy sticky mass. In an early kennel test, plaintiff found that dogs preferred a wetted product rather than a dry meal,

noting that Dog Chow initially enjoyed increased palatability when wetted with three times as much water as Ralston recommended. (PX–4, Bates 5130). But excessive liquid or time in the bowl caused mushiness which allegedly detrimentally affected the taste and the alleged palatability advantage of increased water content. (Mohlie Tr. 14–16, 154; Kinslie Tr. 851–52, 977; DX–72; PX–4, Bates 5764; PX–35A, B & C; PX–43A, Engstrom dep. pp. 5–7, 98–102; DX–24, Bates 7149).

15. In addition, and alleged by defendant to be the sole objective of the program, plaintiff desired to develop a product with a "promotable" feature, namely the simulation of a "gravy-like" appearance when water is added. Plaintiff contends that it sought to produce a product which could form a gravy upon rapid reconstitution in water, and at the same time retain its particle integrity without becoming mushy. If such a product could be developed, plaintiff thought that it would combine the palatability advantages of large amounts of water with a crunchy kib. (DX–72, DX–74, DX–87).

Defendant contends that gravy does not impart a palatability advantage so far as *dogs* are concerned, but does have appeal to housewives who think their dogs enjoy a product with gravy. Hence, it is defendant's position that plaintiff sought to develop a product with a "gimmick" which would be promotable, and that the features now relied upon by plaintiff, namely, "palatability" and "retarded hydration," were not part of their objectives in developing the product.

16. After considerable experimentation, plaintiff developed two products more or less simultaneously, each of which was a porous expanded fat-coated dry dog food. One product was identified by the trademark "Rally," and the other was identified by the trademark "Gravy Train." Both products were similar in some respects to the earlier Purina Dog Chow product in being a porous expanded large sized particle prod-

uct having farinaceous and proteinaceous ingredients. (Stip. 14, 16).

17. The "Gravy Train" product is alleged to have the structure to rapidly absorb substantial amounts of water which causes a softening of the kib exterior. A fat coating and gravy former or "thickener" are added to the surface of the kib during the manufacturing process. The combination of fat coating and thickening material allegedly holds the water close to the surface of the kib, forms a thick gravy over the entire product, and prevents the water from penetrating to the center of the kib. The plaintiff claims to produce a "unique" *kib*, representing an advancement over the prior art. The kib features a fat coating and gravy former which allegedly "retard hydration" to the interior of the kib, thereby enabling the kib to remain crunchy. The coating is capable of forming and designed to form a gravy upon the addition of water. Both features, the retained crunchy texture, and the gravy, are alleged to significantly enhance the palatability of the product over prior dog foods.

18. A test market was initiated in April of 1959 in Wichita, Kansas, and Indianapolis, Indiana, to determine the acceptability of plaintiff's products Gravy Train and Rally. After market testing of both products, Rally was shelved and plaintiff went into national production of its Gravy Train product. (Stip. 17–18)

19. On January 20, 1960, the patentees of the patent in suit filed a patent application Serial No. 3,516, which is the parent of the patent in suit. (Stip. 21)

20. On April 23, 1962, the patentees of the instant patent filed a second patent application, Serial No. 189,310, in the Patent Office, which was prosecuted as a continuation-in-part of the first application Serial No. 3,516. The parent application was abandoned by reason of the election of plaintiff not to respond to the Patent Office Action of October 25, 1961, therein. The second application issued as a patent on January 28, 1964, and is the patent in suit, No. 3,119,691 (Stip. 22–23).

*The Claims Charged to Be Infringed*

21. The first eleven claims are directed to processes involving a series of steps for manufacturing the animal food in issue. Claims 12 and 13 are the product-by-process claims, which claim the product manufactured by the process steps described in claim 1. Plaintiff charges that claims 1, 4, 6, 12 and 13 are infringed by defendant. Claims 6, 12 and 13 are dependent on Claim 1, and contain narrower limitations on the claims mentioned therein. Claim 1 sets forth the following process steps:

1. The method of preparing a particulate dry animal food capable of forming a gravy—containing mixture on addition of aqueous liquid while retaining its individual particulate state without becoming mushy and sticky, said method comprising the steps of forming a farinaceous mixture including

farinaceous starch-containing grain material and proteinaceous material to balance said mixture nutritionally, the amount of said grain material being between 30% and 65% and the amount of said proteinaceous material being between 25% and 40% by weight of said farinaceous mixture; gelatinizing said farinaceous mixture by moistening and heating it to cause starch granules in said mixture to swell with accompanying loss of bi-refringence; subjecting the gelantinized mixture to mechanical working and expansion by extruding it from a confined zone of high pressure and temperature substantially above 212° F. to a zone of lower pressure, thereby forming said mixture into an expanded porous structure of lower density and reducing its moisture content; drying said lower density product to a stable moisture content; and cooling the dried product and coating its surface with a

fat and dry gravy-forming and thickening material capable of rapid reconstitution in water, the relative temperature of said dried product and coating fat being such that the fat forms a surface coating when applied to said dried product; said coating maintaining said material on said surface available for rapid hydration by added aqueous liquid and also retarding hydration of the expanded porous structure of the product by said liquid during reconstitution of said gravy.

22. For convenience, the operative steps of claim 1 are referred to as (1) blending, (2) gelatinizing (cooking), (3) extruding, (4) drying, (5) cooling, and (6) coating with a fat and dry gravy forming and thickening material.

23. Claim 4 is a method claim which recites certain additional limitations in the blending step, the extruding step, the drying step, and the coating step. Claim 6 adds the further qualification to the coating step, that the fat must be applied by "spraying", and the product must be "kept in motion during the coating process to continually expose fresh product surfaces to the fat." Claim 12 claims a product "produced in accordance with the method of claim 1." Claim 13 explicitly claims "carboxy-methyl-cellulose" (CMC) as the preferred dry gravy former and thickener.

## I. Issues of Validity

24. Defendant attacks the validity of the patent on essentially five grounds; (1) that the alleged invention is no more than the addition of a "gravy" powder, which yields only a "gravy" appearance, to a fat coated expanded dry dog food kib which was in prior public use; (2) that the alleged new product is detrimental to palatability rather than advantageous thereto; (3) that the alleged invention is anticipated by the prior art; (4) that the patent is anticipated by plaintiff's manufacture and sale of Gravy Train, since the parent application does not support the claims of the patent in suit;

and (5) that the patent is unenforceable in equity because the patentees misled the Patent Office. Each of these contentions will be explored below.

### (1) The Alleged Lack of Invention

#### (a) The Prior Dry Fat-Coated Porous Dog Food Kib

25. Essentially, defendant contends that the plaintiff's alleged invention simply consists of the addition of a gravy former (a thickener and a dye) to the surface of a fat coated expanded dry dog food kib known to the prior art. At most, defendant posits, the only conceivable novelty is the addition of the gravy former, which it believes not only imparts a palatability detriment to the product, but fails to retard rehydration, as plaintiff claims.

26. Defendant contends that the patented subject matter is unpatentable over the prior manufacture and sale of (1) Purina Dog Chow, (2) Vets' Nuggets dog food by defendant through the agency of its contract manufacturer, Ralph Wells & Co., and (3) Kasco Hi-Protein Dog Food by Corn Products Company.

27. The Purina product and its manufacture antedate by more than a year the filing of the patentees' first patent application purporting to relate to the alleged invention. (Stip. 21, 30–32, Kaiser Tr. 1276–78; DX–73).

28. In addition, defendant contends that the patented subject matter is unpatentable over the Linskey patent, No. 3,139,342, which describes the Corn Products Company's manufacture of Kasco Hi-Protein Dog Food. The application which matured into the Linskey patent was filed in the United States Patent Office on August 17, 1959, more than five months before the filing of plaintiff's first patent application. (DX–45, DX–3). However, the Court finds that the Linskey patent, issued in 1964, and applied for on August 17, 1959, is not properly part of the prior art with respect to the invention in suit. The same conclusion, however, does not apply to the basic

kib[1] used in the Kasco product which is made by the process described in Linskey, as is more fully set forth in the following footnote.[2]

Plaintiff was on the market with its Gravy Train product in April, 1959, several months prior to the Linskey filing date. Moreover, the Gravy Train invention itself was made in early 1958, over a year prior to the Linskey filing date. Plaintiff's April, 1959, introduction of Gravy Train into retail channels is confirmed by General Foods' report on the entire program (DX–24, p. 20), which establishes that the formulation and operating conditions were the same as those that form the basis of the claims in suit. (DX–24 p. 15–18—see also DX–113 for the June, 1959 Gravy Train formula-

tion). Thus there is uncontroverted evidence that the 1959 Gravy Train product was made by a process which conformed in detail to the patent claims.

29. Although considerable controversy exists, and certain minor differences may be apparent between the basic kib produced by the product in suit, and the Purina Dog Chow, Kasco, and Vets' Nuggets Kibs (see Finding of Fact 32, infra), the Court finds that, in essence, the patent does not teach or make a "unique" basic kib.

30. We think that an examination and analysis of these prior products would have revealed their process steps prior to the date of the patent application, or even as soon as the early part of 1958, when the Gravy Train product was al-

1. By "basic kib," the Court means a fat-coated porous, expanded dry animal food kib, without a gravy former or thickener.

2. The process for making Kasco was nominally secret during 1958–1959, before the Linskey application was filed. However, below, in reply to a similar secrecy argument as to the Dog Chow and Vets' Nuggets processes, we hold that plaintiff could essentially decipher the process steps from an examination of the products themselves. Since Kasco was on public sale in 1958, the same conclusion logically should follow *as to its basic kib,* even though Linskey allegedly fails to teach either the pre-gelatinization step, or the cooling step to achieve a surface coating of fat. But if the Kasco kib was to be deemed prior art, as we hold with regard to the Dog Chow and Vets' Nuggets basic kibs, a further inquiry remains.

Linskey teaches the application of a dried skim milk to the product, which defendant claims is a gravy former and thickener. Hence, defendant argues, since a gravy former and thickener were recognizable from the Kasco product which was in prior public use, the plaintiff's claim regarding the novel addition of a thickener and gravy former is anticipated by the prior art, as well as is the method for making the "basic kib."

However, the Court finds that the dried skim milk of the Kasco product is not a gravy former or thickener, within the claims of the patent at bar, as contended by defendant. Defendant concedes that the skim milk coating was not added to the product for the purpose

of simulating the appearance of gravy upon the addition of water. (Def. proposed Finding of Fact V–18). And Mr. Kaiser testified that Corn Products was interested not in a gravy formation, but wanted as speedy a hydration as possible. (Kaiser Tr. 1286–87, 1310, 1313).

Plaintiff's expert, Mr. Harris, categorically stated that dried skim milk is in no sense of the term a gravy former. And we are convinced from his tests, as set forth in his notebook, that dried skim milk has little if any effectiveness in retarding hydration of the kib. (Harris Tr. 483. DX–110, Exps. 10, 11, 12, 14, 16, 32, 33, 36, 37, 38, 39, 41, 42, 43, 44, and 46). Certainly retardation of rehydration was not the function of the skim milk, was not understood as such, and upon testing showed little resemblance to the propensities in that regard of CMC. The patent in suit describes its "dry gravy forming and thickening agent" in terms of its ability to retard hydration of the kib, (DX–1, col. 2, lines 26–46), and as such the terms must be construed with that in mind. The evidence did not show that dried skim milk "is a dry gravy forming and thickening agent" as defined and specified in the patent.

Hence, even were the Linskey patent considered to be part of the prior art, which it is not, and even though the basic kib of the Kasco product is considered to anticipate the basic kib of the patent in suit, the Kasco product could not in any event be considered to anticipate the novel addition of gravy former and thickener to the basic kib, which is featured in the instant patent.

legedly invented. Although plaintiff contends that the processes for making said products were maintained in secrecy, we think that plaintiff's technical people and others skilled in the art substantially knew or could have discovered the methods used to make Dog Chow, Vets' Nuggets, and Kasco. We think the facts are unclear as to the degree of secrecy which was exercised over the manufacturing processes of these products. One of the patentees, Mr. Schara, however, admitted he had a "general" idea that the Purina product was made by a series of steps, which correspond in most respects to the process used by plaintiff, (DX–121M, p. 11). In evaluating whether defendant's product infringed upon Gravy Train prior to this suit, both Mr. Schara and Mr. Hudson, one of plaintiff's attorneys, were able to determine the technical aspects of various competitive expanded fat and gravy coated dry dog foods and their manufacturing processes, based entirely upon their examination of the products and their properties, and without any direct knowledge of the method of manufacture of any of them. (DX–27 p. 3; DX–2 p. 28–36). In view of this, it is illogical for the Court to believe that plaintiff's experts were unable to determine with some degree of accuracy, the processes employed in making the fat coated expanded kibs of the prior art.

31. The Court has considered plaintiff's contention that one skilled in the art could not determine from the Purina, Kasco or Vets' Nuggets products whether their manufacturing processes included a "pre-gelatinization" step,—that is, a step of cooking of the blended material prior to its entry into the extruder. Plaintiff points out that the specification suggests a method for determination of pre-gelatinization which includes examining the mix under a polarizing microscope prior to its entering the extruder for the "mechanical working and expansion" step. (DX–1, col. 3, line 69). However, the patent *claims* do not require or even suggest that gelatinization must take place *before* entry of the mixture into the extruder. Although the specifi-

cation (DX–1, col. 3, lines 43–47, 59–75) suggests that partial or pre-gelatinization is important, plaintiff's expert, Mr. Harris, testified that some gelatinization may take place during the mechanical working and expansion step in the extruder. (Tr. 628–630). Furthermore, there does not appear to be a detectable difference in the product when gelatinization takes place in the extruder, rather than in a pre-gelatinization step. (Kaiser Tr. 1280–82). Hence, we conclude that the alleged necessity of a pre-gelatinization step, even if assumed to be an integral part of the patent, is not of sufficient importance in and of itself, to justify characterizing plaintiff's kib as "unique."

32. The minor differences which exist between the Gravy Train basic kib, on the one hand, and the Vets' Nuggets, Kasco, and Dog Chow kibs on the other, (Tr. 1251–53; DX–71), are insufficient to justify a finding that plaintiff's kib is unique, for those differences are not sufficient improvement, if improvement at all, to warrant patent protection. American Infra-Red Radiant Co. v. Lambert Industries, 360 F.2d 977, 987 (8th Cir. 1966); General Mills Inc. v. Pillsbury, 378 F.2d 666 (8th Cir. 1967.)

33. Finally, it is significant that the plaintiff, through its counsel and one of the patentees, agreed with the Patent Office Examiner that the manufacturing of an expanded fat coated dog food product did not constitute an invention, due to the teaching of prior art patents Mathews (No. 2,120,138), Chapin (2,489,-267), Graves (2,853,027), Lanz (2,945,-764), and Guidarelli (3,014,800). (DX–2 p. 125–126; Mohlie Tr. 319). Indeed, Mr. Mohlie testified that "the production of an expanded animal food is not a part of the novelty of our invention." (Tr. 319)

34. Accordingly, we find that plaintiff's basic kib and the process employed for making it cannot be considered, alone, to be unique. But as plaintiff urges, the kib is only a part of the total process and product which includes the novel gravy former, which it claims, "is *in no*

*way suggested, much less disclosed,* in the prior art * * * " (DX–2, p. 126) (emphasis in original) [3]

(b) *Retarded Rehydration*

35. Despite our finding that the basic fact coated expanded kib was in prior public use, it is clear that plaintiff stakes its brief for patentability upon the alleged unique addition to the kib of a gravy former which produces a gravy upon rapid rehydration, but which retards hydration to the interior of the kib, thereby preventing mushiness. (See DX–2, p. 126). Defendant contends that the gravy former was added as a gimmick and designed merely for promotion purposes. It believes that the gravy does not retard rehydration, is a detriment to palatability, and is an obvious addition to the basic fat coated porous expanded kib.

36. It is true that one of plaintiff's objectives was to develop a product incorporating a "promotable" selling feature. That many consumers preferred to add water or table gravy to dry dog foods undoubtedly spurred plaintiff's efforts to develop a dog food with a gravy feature.

37. However, the evidence also showed that the addition of excessive water to prior art dog foods converted them to sticky relatively unpalatable mushes. Thus the desire to develop a product which retained a crunchy texture upon the addition of water, and resisted mushiness, was not inconsistent with the desire to produce a winner in the consumer market. Indeed, the two objectives seem to coalesce.

38. Plaintiff's experimenters first attempted to overcome the mushiness problem by working with the physical characteristics of the kib itself. The patentees Mohlie and Schara, under the direction of Ludington, made many products with a Wenger extruder in an effort to develop a suitable base kib. They made certain changes in the kib, which did not amount to patentable advances over the prior art, but they soon realized that the kib alone was not the answer to their research objectives for it developed mushiness and stickiness when rehydrated with high levels of water. (Mohlie Tr. 17–20; DX–72).

39. Patentee Ludington then suggested that perhaps the product could be made to accommodate the desired addition of large amounts of water to increase palatability if a dried product could be developed which surrounded itself with an appetizing gravy upon the addition of water. (Mohlie Tr. 20–21; PX–2, Bates 5753.)

40. The experimenters knew that gravy formers and thickeners, such as Guar Gum and CMC were unpalatable substances, so they experimented with other gravy-type products. They attempted to make a liquid gravy with a tasty fat base and apply it to the surface of the kibs, and then evaporate the excess moisture to leave what they hoped would be an instant gravy on the surface. They theorized it would turn back into gravy when the pet owner rehydrated it with water before serving. This approach proved unsuccessful, however, because the gravy penetrated the interior of the kib when applied and, after drying, failed to form a gravy when water was added. Instead, the water soaked into the kib to produce a mushy mess just as if there had been no gravy applied at all. (Mohlie Tr. 22, 31–32; DX–74, Bates 5755–57; DX–121J, Ludington dep. pp. 373–74.)

41. At this stage the inventors determined to try a gravy made from the unpalatable gravy former, with no fat. They dried the gravy former on the surface of the meal; however, the gravy former could not be reconstituted and it did not give a gravy appearance. (DX–74, Bates 5757–59.)

---

3. Because the process in suit does include the gravy former with its alleged patentable features, defendant's argument that an allegation of infringement against Gravy Style is an admission that Vets' Nuggets anticipates, is of no force. (Def. brief p. 18)

42. Since the inventors had "no luck reconstituting a wet gravy after it had been dried on the surface of the meal," they concluded they were "using the wrong approach" and "decided to add a dry gravy mix by dusting on the surface of the meal." In this series of experiments they tried to cement the thickening material on the surface by moistening the kibs and dusting on the thickener. This also failed to solve the problem as the water quickly penetrated the kib and was therefore unavailable upon rehydration. (Mohlie Tr. 23; PX–4, Bates 5759–60).

43. At one point, they "backed off" from their objective of achieving a thick gravy and merely applied a coloring material to the kib which would produce a brown *au jus* roast beef broth effect when water was added. This was still another "step in the wrong direction," however, for water quickly penetrated and was soaked up by the kib upon rehydration. (Mohlie Tr. 23–24; PX–4, Bates 5130.)

44. The inventors finally decided to repeat their last series of unsuccessful experiments where a dry gravy former was dusted on the kib, but to interpose a layer of fat between the kib and the gravy former. The fat would serve the dual purpose of anchoring the gravy former and shielding the kib from water penetration for a sufficient period to permit the water to be thickened with a gravy. They speculated that the fat coating would retard the water from penetrating the kib, and they hoped that the fat would retard the hydration long enough to enable the thickener on the outside "to grab" its share of water. The first thickener tried in combination with a fat coating was guar gum. This combination enabled hydration of the exterior portion of the kib. It converted much of the added water to a thick gravy, both on the kib surface and separate from the kib in the bowl, and it retarded penetration into the core of the kib. Through this process, the kibs retained their crunchy centers and resisted sogginess. (Mohlie Tr. 31–35; PX–43F, Ludington

dep. p. 365–67; DX–121J, Ludington dep. p. 444–45; DX–75, Bates 5780–81.)

45. The foregoing description of plaintiff's attempts to achieve a kib which avoided mushiness was adopted essentially from plaintiff's Proposed Findings of Fact. Defendant introduced no persuasive evidence to suggest that plaintiff's experimental process was not as related above.

46. Defendant has contended that the patentees were merely struggling to add a gravy added appearance to a product like Dog Chow as a gimmick, with no thought of preventing stickiness through the medium of a gravy former or of controlling the rehydration characteristics of it. But the inventors' notebook reveals they constantly tested for a product that would resist "stickiness." The first entry mentioning the gravy proposal was March 3, 1958 (PX–2, Bates 5753), and the inventors noted that the "core binder seemed to make the surface slightly sticky" (PX–2, Bates 5755). They noted as "Disadvantages" on March 11, 1958 that the experimental gravy-added products without fat coating "became quite sticky after standing for a few moments. They also tended to stick in the dish— lost their fluffy texture" (PX–4, Bates 5764). Several days later the inventors' notebook confirms their objective to enhance palatability by developing a product that could tolerate larger amounts of water than permitted under prior art recipes (PX–4, Bates 5130). On April 16, 1958, the inventors tested products on which gravy was dusted on the surface after the fat addition. They noted that "there seemed to be a good pick up of the gravy mix" when the product was rehydrated at 1:1.5 and were not sticky: (DX–75, Bates 5780–81). The subsequent project report, issued March 1962 covering work from February 1957 to January 1960, corroborates that objectives included "improved rehydration properties," "good rehydration with no stickiness or loss of particle form" (DX–24, Bates 7138) and "rehydration properties such that the product would absorb water in the range of 200 percent of its

dry weight and still retain its original particle identity" (DX–24, Bates 7149–50).

47. The extensive testimony of plaintiff's witnesses that the fat coating and gravy former coact to retard the rehydration and consequent sogginess of the kib interiors is confirmed by defendant's former research manager (PX–43A, Engstrom dep. pp. 9, 71, 73–74), and by a courtroom demonstration in which rehydrated Gravy Train and Vets' Gravy Style resisted stickiness more than the rehydrated non-gravy Vets' Nuggets and Purina Dog Chow products. (Mohlie Tr. 150–154). This was perhaps the most vivid demonstration to the Court of the retardation propensities of the product.

48. Although the photographic exhibits introduced by plaintiff were in some respects relatively ambiguous on the issue, we think on the whole they tend to support plaintiff's theory of retarded rehydration. (PX–38, 39, 39A, 39B, 39C and 40).

49. The evidence introduced by defendant was not probative to disprove the retarded rehydration advantages of plaintiff's patented product. Dr. Dunker's test averages failed to include all the tests shown in defendant's laboratory analysis reports (Dunker Tr. 1452–54), he tested at only a single time interval (2 minutes) insufficient to indicate prolonged tolerance to added water (DX–115), and he admitted that this description of the rehydrated kibs was "not too exact" (Tr. 1463). Dr. Rosner did not carry forward to his report certain tests reflected in his notebook showing that the gravy former retarded rehydration (Rosner Tr. 1566–78). Mr. Smith testified solely from memory and kept no record of his tests or test conditions (Smith Tr. 1238–40).

50. And there is no support in the record for defendant's alternative argument that retarded rehydration in Gravy Train occurs because of extruder and cutting conditions. Although Mr. Mohlie did testify that other factors such as extrusion and cutting also affect rehydration, he specifically pointed to the cell structure of the base kib and the coating of fat and gravy former as the key factors in retarding rehydration. (Mohlie Tr. 33–34, 216, 225)

51. The Court finds that the plaintiff's theory of retarded rehydration has strong support in the evidence.

52. The Court further holds that the addition of a gravy former to the basic kib is not obvious. Defendant contends that the addition of water to a kib coated with a thickener will naturally result in less rehydration, for thick water penetrates a porous product more slowly than thin water. (Def. Brief p. 55–56).

53. However, the plaintiff used an ingenious approach which completely departed from the prior art. No one ever made a dry gravy forming animal food before plaintiff. Prior dry dog food recipes directed the consumer to limit the amount of water used to wet the product, but the inventors employed large amounts of added water. (Three to six times the water permitted under the recipes for the Purina Chow or Kasco products—Mohlie Tr. 34; Kinslie Tr. 872; DX–84, Bates 5436; DX–106B; PX–43F, Ludington dep. p. 366–67). They achieved an unexpected phenomenon by adding materials (CMC, guar gum and like thickening agents) which *per se* detracted from palatability, and by using such thickening agents, which were known to attract and hold water, as the means to impede penetration of water and preserve the particle integrity of the product. There is no suggestion in the literature on thickening agents that these materials could be used to retard or control hydration. (Mohlie Tr. 33–34, 43, 225; Harris Tr. 433–37, 825; DX–121J, Ludington dep. p. 445).

54. We must conclude that defendant's argument is the sheerest hindsight, which usually is of little value in patent matters as well as in other areas of law.

### (c) *Palatability*

55. Even though the gravy former has proved to retard rehydration the

Court finds that another factor which must be considered in determining the patent's validity is whether the product achieves the announced goal of enhanced palatability. There is no doubt that thickening agents *per se* constitute a detriment to palatability. However, plaintiff contends that the use of thickening materials permitted the addition of greater quantities of water than could be used with the prior products, thereby enhancing palatability through the unlikely medium of an unpalatable agent (the thickener).

56. There are many factors other than the presence or absence of "gravy former" which affect palatability, including formulation of the kib, fat content, size, shape and roughness of the particle, and the presence of flavor additives. (Harris Tr. 798–800).

57. Any palatability comparison between a gravy-containing product and a product without gravy is inconclusive with respect to the effect of "gravy" on palatability, unless the products and feeding conditions are identical except for the presence or absence of gravy. (Schara dep., DX–121M, p. 169). Hence, the Court finds that the only objective and definitive evidence of the effect of "gravy" on palatability would lie in direct comparative kennel palatability tests between identical dog food products with and without gravy.

58. The conflict which exists is that plaintiff would also have us take into account kennel tests involving palatability factors extraneous to the presence or absence of gravy (Schara dep. DX–121M, p. 169), and short term consumer market tests, which inherently involve extraneous consumer acceptance factors. It seems logical in evaluating the effect of gravy formers on palatability to eliminate all other variables from the testing. The kennel tests which include other variables are unreliable, since the variables other than gravy formers may account for the palatability differential. For example, the kennel tests cited by defendant which indicated that Rally outfed Gravy Train (DX–24, Bates 7137; DX–71, Bates 5041; DX–70, Bates 5035), are unpersuasive, since it is possible that Rally's 20% larger meat meal content accounted for the result. (Harris Tr. 691, 801–02). Likewise, any kennel tests comparing Purina Dog Chows or Vets' Nuggets to Gravy Train are of little value on this issue since the products may differ in meat meal content, fat content, size, shape or roughness of particle, and flavor additives.

59. In addition, consumer market tests are unreliable indicators of palatability for they may well reflect the dog owners' preference for a gravy type product, rather than the dog's own preference.

60. Hence, scientifically speaking, the only objective palatability tests would be ones comparing the identical kib product with and without the gravy former.

61. The Court finds that the results of kennel tests meeting the above standards which were introduced in evidence show no consistent patterns. For instance, several early tests showed the basic Gravy Train kib without gravy former preferred to the finished product. (DX–28; DX–76). And in defendant's tests which isolated the gravy factor and which were run specifically in preparation for this trial, Dr. Rosner found that the product without gravy was preferred over the gravy product. (Rosner Tr. 1524–23, 1539–43; DX–93–A, 93–B, 93–C). However, Dr. Rosner's tests used only one water to kib ratio.

He failed to produce any feeding data as to the effect of prolonged rehydration on a gravy forming versus a non gravy forming dog food. (Tr. 1561). His statistical calculations as to the comparative effects of thickeners in Gravy Train were based upon tests using only a small number of dogs, and he could make a preference determination only at greater than a 5% confidence level (Tr. 1528), as to which he stated:

"Well, I would regard this as being significant information, without stating that this result is conclusive. That is, knowing the variability of dog feed-

ing studies, I would not regard this one test as being conclusive to the effect that the addition of gravy is a negative factor in palatability." (Tr. 1529).

62. On the other hand, certain tests introduced by plaintiff which measured the gravy factor indicated a preference for Gravy Train over the same kib without gravy former, although not at a high significance level. (DX–112C; DX–112A, Bates 7718, Bates 7722, Bates 7724, and Bates 08035; and DX–112B, Bates 8010).

63. And many tests were unpersuasive either way. (E. g. DX–24)

64. Accordingly, from the evidence presented, the Court adopts the viewpoint that kennel tests, as such, are unreliable indicators of palatability preference in a situation where the single variable, gravy former, is being studied, and concludes that the results of the various palatability tests presented are inconclusive. The Court is unable in good conscience, to conclude that the kennel tests are indicative enough of palatability preferences, to warrant a finding either that gravy or non gravy products of the type in dispute are more palatable. We are reluctant to base a conclusion on the issue of validity, upon such ambiguous and unreliable evidence.

65. The patent is presumed to be valid, in the absence of clear and convincing proof to the contrary, and we do not believe defendant has met its burden merely by convincing the Court that the results of objective palatability tests are inconclusive.

### (d) Commercial Success

66. On the other hand, it is significant that Gravy Train has met with substantial commercial success. In spite of the palatability tests cited by defendant showing Rally to outfeed Gravy Train, in consumer market tests Gravy Train was clearly the better product. Rally was a complete failure in two distinct market tests. (Tr. 891). As a result, General Foods dropped Rally and proceeded with Gravy Train.

67. Within a year after General Foods' national introduction of Gravy Train, it achieved a 19% share of the entire dry meal market. (Baker Tr. 245–46; DX–9,10)

68. For the six year period since its introduction, Gravy Train has sold better than $20,000,000 a year. According to the Vice President of General Foods' Post Division, this product "had one of the fastest acceptances by dog owners of any dog food that we had marketed or had seen marketed up to that point in time * * * any product that will sell continually for better than twenty million dollars is an exceptionally fine product by General Foods' standards." (Baker Tr. 248)

69. Although plaintiff expended $4,-500,000 on advertising for Gravy Train in 1961, a figure which was down to $3,000,000 in 1966, Mr. Baker testified that such expenditures are "normal to light" for this type of product. (DX–31; Baker Tr. 248, 259–62, 267–78). However, plaintiff's advertising agent stated that the planned advertising budget for Gravy Train, as of January 1, 1960, "surpasses any previous introductory program in the field of commercial dog food." (DX–51, answer to Interrog. 27(b); Baker Tr. 271–272).

70. In December-January 1962–3, Gravy Train rose in sales to a level of 20.6% of the dry dog food market (DX–30, Bates 8151, lower right graph). Thereafter, its sales percentage dropped steadily until it held only 13.7% of the dry dog food market by February-March, 1966. (DX–30, Bates 8138, Bates 8151, lower right graph). During the same period, Purina Dog Chow sales rose from 30.5% to 35.5% of the dry dog food market. (DX–30, Bates 8138, lower graph.)

71. The Court believes the decrease in Gravy Train sales to have resulted to some degree from the vigorous competition generated by defendant and other manufacturers of gravy style dog foods. Indeed, defendant paid tribute to the commercial success of Gravy Train by

the production of its own gravy style product, and by conceding that the gravy type product is "the fastest growing segment in the dry dog food section today." (PX–14) And the commercial success of Gravy Train is underscored by the fact that it has been on the market long enough so that the people who are unduly influenced by advertising have come and gone for the most part. Most of the users now are basically people who are attracted to the product through their use of it, which indicates that it must have some basic palatability appeal to their dogs.

■ 72. The Court is aware that commercial success does not tend to establish validity unless it is shown that the commercial success is due to the alleged invention rather than to other product or extraneous factors. B & M Corporation v. Koolvent Aluminum Awning Corporation of Indiana, 156 F.Supp. 691, 698 (S.D.Ind.1957), affirmed 257 F.2d 264 (7th Cir. 1958); R-Way Furniture Company, Inc. v. Duo-Bed Corporation, 216 F.Supp. 862, 868 (N.D.Ill.1962); Kennatrack Corporation v. Stanley Works, 216 F.Supp. 394, 396 (N.D.Ill.), affirmed 314 F.2d 164 (7th Cir. 1961). Defendant contends that factors other than the claimed invention affect the product's sales, such as certain ingredients and characteristics of the physical product, plus external factors such as advertising, promotion, size of sales force, seller's reputation, and the generally expanding market.

73. However, in the Court's judgment, plaintiff's unique concept of adding a gravy former to a fat coated expanded dry dog food kib with resultant retardation of rehydration, is in large part responsible for the degree of commercial success Gravy Train has enjoyed. It has resulted in the production of a crunchy kib which is served with a thick gravy—a "new" product over the prior art. Regardless of the inconclusive effect of the objective palatability tests, the product must have a good deal of palatability appeal to the pets who are served it. It is unfortunate that we cannot ask them. But we think the combination of the invention, the commercial success of the product and the obvious tribute paid to the product by the subsequent gravy style products militate toward the validity of the patent despite the absence of persuasive evidence on palatability. The burden of proof on the issue rests heavily upon defendants, and by their above arguments they have failed to convince the Court that the patent is invalid.

(2) *Are the Claims of the Patent Supported by the Parent Application?*

74. Plaintiff's experimenters Ludington, Schara and Mohlie filed a patent application on their Gravy Train invention on January 20, 1960, Serial No. 3,516. The prosecution history of this application consisted of two one-page actions by the patent examiner and a single two-page amendment by the applicants. The examiner in the first action held that original claim 9 was patentable. But he rejected the other claims as "unpatentable over" prior art patents to Luft 1,380,815 and Evans 2,641,547, who taught the production of human foods such as gravy materials, condensed soups, etc., in view of Lanz 2,945,764, who suggested temperature control to achieve a surface coating of fat on a dog food. (DX–3)

75. The patentees refiled their application on April 23, 1962, as Serial No. 189,310. Plaintiff alleges that the refiling was for the purpose of explaining some of the described phenomena more fully. The first, or parent application was then abandoned, and the patentees prosecuted this second application as a continuation-in-part until it was granted as the patent at bar.

76. Defendant alleges that the patent in suit is not supported by the language of the parent application. If that is so, the patent is invalid because Gravy Train was on sale more than one year prior to the date of the continuation-in-part application. 35 U.S.C. Sec. 102(b). Specifically, defendant claims that the

terms "retardation of rehydration" or "controlled hydration", and "thickener" find no support in the parent application.

77. Plaintiff claims that although some of the precise terms used in the patent in suit are not found in the parent application, the same ideas are described in somewhat different language in the parent. In addition, plaintiff contends that if one prepares the Gravy Train product in accordance with the teachings of the parent application it will be exactly the same product as if one followed the teachings of the continuation-in-part application which matured into the patent in suit. (Harris Tr. 483–85)

78. The Court finds that the language of the patent claiming "retardation of rehydration" is supported by the claims of the parent application. The parent discloses the concept of a base kib which will rapidly absorb water, (DX–3, p. 1, 1st para.; p. 3, lines 3–4), yet which is characterized by "retention of particle identity during and after hydration" (DX–3, p. 1, lines 4–5), so that the kib does not become mushy or doughy. (DX–3, p. 1; 1st para. p. 3, lines 4–5; p. 13, lines 10–11). It is quite clear from a reading of the parent that its objective was to retain the integrity of the particles so as to eliminate mushiness, (DX–3, p. 2, line 1–18; p. 3, lines 1–7; p. 11, lines 1–12; p. 13, lines 6–13) which inherently implies that the kib retards hydration.

79. It is conceivable on a very narrow and literal reading that the words "retention of particle identity" may encompass the meaning ascribed to them by defendant's patent expert—namely, that a particle may take up water rapidly and become saturated with it, and still remain a discrete particle unjoined to nearby particles. (Wallenstein Tr. 1613). But in the context of the language appearing in the parent, it is clear to the Court that the parent application intended to teach the concept of retarded hydration even though not using those words to do so. As we re-marked at the trial in response to Mr. Wallenstein's distinction:

"Isn't that what they are talking about, the ability to absorb water and yet maintain the integrity of the product? * * * (Wallenstein Tr. 1612)

\* \* \* \* \* \*

"Well, when they say that the ability of the product to retain its individual particulate shape on wetting is there, wouldn't you think that that's (retardation of rehydration) what they are talking about?" (Wallenstein Tr. 1613).

██ 80. The test is what the parent application teaches the man skilled in the art. (Harris Tr. 483–85; Wallenstein Tr. 1699–1703). It need not be a carbon copy or use the precise language of the continuation-in-part application. Emerson v. National Cylinder Gas Co., 146 F.Supp. 581, 588 (D. Mass.1956); Canaan Products Inc. v. Edward Don & Co., 273 F.Supp. 492 (N.D.Ill.1966); Illinois Tool Works,. Inc. v. Continental Can Co., Inc., 273 F.Supp. 94 (N.D.Ill.1967); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 880 (7th Cir. 1966). We are willing to credit the testimony of plaintiff's very able expert, Mr. Harris, that a man skilled in the art would learn the objective of retardation of rehydration from the claims of the parent. (Harris Tr. 483–85).

81. Defendant points out that the expression "retention of particle identity during and after hydration," used in the parent application, appears also in the patent application filed by plaintiff to cover its Rally process and product, (DX–23, p. 1, lines 4–5) (The Burgess application, Serial No. 862,771), despite the fact that that product had no gravy former or thickener to retard rehydration. This circumstance was troubling to the Court, and was the only argument which caused us to hesitate in deciding that retardation of rehydration is taught by the parent. Plaintiff contends that this argument is irrelevant, for reason not cogent enough for us to understand. Perhaps

for that reason, at trial we reserved a ruling on the argument's relevancy. (Wallenstein Tr. 1619–1621). However, we think the argument is relevant—and plaintiff's objection may go only to its weight.

82. Nevertheless, we are constrained to uphold the sufficiency of the parent language against the seeming logical appeal of defendant's argument. The Court is convinced that the language of the parent supports the idea of retardation of rehydration which is expressly set forth and more fully explained in the continuation-in-part, for the reasons suggested in Findings 78–80, supra. Were we to find the patent invalid because of the argument now under consideration, it would not be for the reason that the language of the parent fails to support the claims of the continuation-in-part application, but for the conjectural reason that the Burgess application, using the identical language of the parent, is directed to a product without retarded rehydration, and therefore, so must be the parent of the patent in suit. This kind of a decisional process fails to accord homage to the cross of clear and convincing proof which defendant must bear. Defendant's argument fails to disturb the presumption of validity, in our judgment.

83. The parent application of the patent in suit adequately supports the feature in the issued patent relating to the capacity of the dog food for absorbing large quantities of water. The parent case teaches the use of much more water for Gravy Train than for prior meal-type dog foods and the same water proportions are set forth in both the parent application and the patent in suit. (Wallenstein Tr. 1725–1727; DX–3, p. 3, lines 3–4; p. 10, lines 23–26; p. 13, lines 6–7).

84. Mr. Wallenstein argued that the parent does not have a criterion for "thickener." (Tr. 1609). It is undisputed that the parent does not use the word "thickener." But it does identify certain "gums" (DX–3, p. 10, lines 9–16), and names certain materials which it states are gravy formers. Those mate-

rials, with the exception of corn flour, all happen to be thickeners. In addition, the parent states that CMC, a known gum, (Wallenstein Tr. 1743; PX–45; DX–49, p. 2), is the preferred gravy former when used as an adjunct to pregelatinized starch. (DX–3, p. 10, lines 17–19). Such materials as CMC have long been known as "thickening agents." (DX–46, p. 943.)

85. However, in conjunction with the function of retardation of rehydration, found to be inherent in the language of the parent, the naming of specific materials which are thickeners would make clear to one skilled in the art their function to retard rehydration· so as to preserve particle integrity. Accordingly, the Court thinks that the concept of thickening is taught and supported in the language of the parent.

86. The "gums" listed as gravy formers in the parent may also be classified as "emulsifiers." (Wallenstein Tr. 1743–4; DX–49, p. 4, 3d item). However, defendant has introduced no evidence to show that their function as emulsifiers has any bearing upon the process described in the patent at bar. That they may be classified in several categories of chemical agents, in no way derogates from their function as described in the language of the parent application. (DX–3, p. 10, lines 20–23).· From the context of the complete process described in the parent, it is clear to one skilled in the art that the gravy formers described therein act as thickeners. The continuation-in-part application merely articulates with greater· clarity the function which is inherently set forth in the parent.

87. On May 1, 1961, plaintiff filed a patent application in Great Britain which was given Serial No. 15640/61 and which was later granted and published (January 9, 1963) as British Patent 915,039 (DX–19; DX–102). This British application combined the disclosures of the United States Rally and Gravy Train applications (Serial No. 862,771 and 3,516, respectively) and named, as inventors, the applicants in the Rally application

(Burgess and Mellentin) as well as the applicants in the Gravy Train application (Ludington, Schara and Mohlie) (DX–19).

88. Plaintiff's British application, as filed, described the "gravy-forming agent" of the alleged invention in the same terms as the parent United States Gravy Train application, omitting any mention of thickening as a function, or criterion, of the "gravy-forming agent" (DX–102, Bates 7396–7, 7399; DX–3, pp. 10–11, 13).

89. Plaintiff's British patent application was amended to define "gravy-forming agents" after the British Examiner indicated that he did not understand the properties of the "gravy-forming agent" (DX–102, Bates 7411). As defined in the added amendment "gravy-forming agents" were "materials which give a color and/or flavor to the aqueous liquid employed to moisten the food and also those materials which raise the viscosity of the liquid." (DX–102, Bates 7408, lines 25–30) This definition appears in the issued British patent. (DX–19, p. 4, lines 53–59).

90. However, the Court does not believe that plaintiff's varying descriptions of "gravy formers", one including and one excluding "thickening" as a function, affects the meaning of gravy former as used in the parent application. This is because in the British application plaintiff was able to obtain certain broader claims not limited to the thickener, because British standards of patentability are lower, as defendant admits. (Def. Brief, Appendix D. p. 7).

91. Claim 13 of the patent claims a dog food according to claim 12, wherein the dry gravy forming agent is carboxy-methyl-cellulose (CMC). However, the parent application nowhere discloses CMC, by itself, as a gravy former. The parent did not include CMC in the list of gravy formers. (DX–3, p. 10, lines 9–16). It was disclosed only in a separate category as an adjunct to pre-gelatinized starch. (DX–3, p. 10, lines 17–19). Since the original application discloses CMC only in combination with another essential ingredient, there is no support for a claim which covers CMC alone. Plaintiff's attempts to include CMC in the classification of "gums" as defined by the parent, (DX–3, p. 10, lines 9–16), is of no avail. (See plaintiff reply brief, p. 44). Where a patent seeks to claim a specific product ingredient as an essential part of its process, it should do so in unequivocal language. That was not done with regard to CMC in the parent application. Thus, it is the Court's finding that claim 13 of the patent in suit is not supported by the parent application, and is entitled to a filing date no earlier than April 23, 1962, the date that the continuation-in-part application was filed. It is accordingly fully anticipated by plaintiff's own use of CMC as the preferred gravy former in its manufacture and sale of Gravy Train more than one year prior to that date.

### (3) The Unclean Hands Defense

92. Defendant has contended that the patentees were guilty of fraud on the Patent Office for failing to make the Dog Chow, Vets' Nuggets and Kasco brand name products a part of the Patent Office record during patent prosecution. Indeed, the Court has already found that the named products were made by a process which we deemed to be in public use, and that the basic kib employed in the Gravy Train product, and its manufacturing process, were not "unique" in view of the prior art dry fat coated expanded porous animal food kibs. In view of the allowance of plaintiff's petition to have the instant patent application made special, the charge of "unclean hands" takes on added significance.

93. Plaintiff's expert, Benjamin Harris, testified that the closest prior art patents and publications were either cited by or called to the attention of the patent examiner by plaintiff during prosecution in the Patent Office. The examiner allowed the patent in suit after considering these patents and concluding that they neither singly or in combination

taught the invention in suit. (Harris Tr. 468–70).

94. The Mathews 2,120,138 and Chapin 2,489,267 prior art patents considered by the Patent Office during prosecution of the patent at bar generally taught how to produce an expanded dog food product through extrusion, but the products of these patents had neither fat coating nor any gravy forming and thickening agent. Moreover, the expanded products which are extruded as described in these patents had a low moisture content, and Chapin used an expandible clay for getting expansion. In contrast, the patent in suit calls for gelatinization of a high moisture content mixture—not mentioned in either Mathews or Chapin—and it accomplishes expansion without the aid of an expansion agent such as clay. (Mohlie Tr. 321–2; DX–2, p. 51; PX–32—Chapin patent, col. 1, line 15).

95. The Graves patent 2,853,027, upon which the examiner ultimately relied as his primary reference before granting plaintiff's patent, discloses a process for making an expanded product for human consumption with a cheese flavoring applied thereto, such at Fritos and Cheetos, etc. The examiner first speculated that Graves' cheese flavoring might suggest the addition of a fat and gravy former. On reconsideration, however, he withdrew this rejection after plaintiff tested the Graves products with the gravy formers of the invention in suit and found that neither fat nor fat plus gravy former was effective to control the rehydration of the Graves collets. (DX–2, pp. 77–84, 91–98.)

96. The Patent Office allowed plaintiff's patent over Lanz 2,945,764 and Guidarelli 3,014,800 which taught the impregnation of dog food pellets of the non-expanded type with fat by applying hot fat to pellets maintained at high temperatures. The examiner used these references, however, to hold that cooling would induce a surface coating of fat. (DX–2, pp. 51, 71; Harris Tr. 469–482). But the invention in suit involved more than application of a fat coating to an expanded

dog food, so the examiner allowed plaintiff's patent over such prior art.

97. The Luft 1,380,815 and Evans 2,641,547 prior art patents cited during prosecution disclosed the immersion of non-expanded ground farinaceous materials or starch flakes in melted fat and the addition of flavoring and other food ingredients to produce a product which, upon the addition of water, makes gravy, condensed soups or similar products. These patents merely teach one how to make a hydratable gravy or soup to be consumed as a liquid only, and patentees readily acknowledged this during prosecution. These patents are not concerned with controlled rehydration of a solid product in order to improve palatability, and the examiner properly allowed the patent in suit over these references. (PX–32—Luft patent 1,380,815 and Evans patent 2,641,547; DX–3, both of examiner's actions; DX–2, pp. 51, 64, 71.)

98. Taken individually and in combination, none of the prior art cited by the Patent Office suggested or even hinted at the addition of a gravy forming and thickening agent to a fat coated expanded kib in order to achieve controlled rehydration. (Harris Tr. 467–68; Mohlie Tr. 31–32.)

99. We think, as did Mr. Wallenstein, that it would have been better practice had plaintiff disclosed the prior art Dog Chow, Vets' Nuggets, and Kasco products to the Patent Office. (Wallenstein Tr. 1682). However, we do not think a fraud was committed on the Patent Office by the omission of those items in the file history. That judgment was concurred in by Mr. Wallenstein when he stated that in his opinion the applicants did not attempt "to deceive the Examiner in the slightest." (Wallenstein Tr. 1681–82).

100. In the first place, none of the prior art dog food products has a coacting fat coating and gravy former, and none can tolerate the very large amounts of water permitted by the recipe of the product in suit, without becoming mushy

and soggy. This product, as well as the patents considered by the Patent Office, demonstrate that those skilled in the art did not perceive that the mushiness problem could be overcome by discovering a mechanism to control rehydration. Although the patent in suit does not teach a "unique" process for making the basic kib, it clearly represents a patentable advance over prior art expanded dog food products because of its invention of a device to control rehydration, prevent sogginess, and retain particle integrity upon the addition of large amounts of water.

101. In the second place, the Patent Examiner was well aware of the existence of prior expanded fat coated dry dog food products, even without a specific reference to Nuggets, Dog Chows, or Kasco. Indeed, we find that plaintiff expressly acquiesced in the Examiner's position that "fat coated chunks were known as a dog food" before the Gravy Train invention. Defendant contends that the antecedent for "fat coated chunks" is only the compressed pellets of Lanz and Guidarelli. Page 126 of the file history, however, leaves no doubt that "fat coated chunks" refers to expanded food products as typified by Graves, as well as Lanz-type pellets. Thus, patentee's admission as to what was known prior to their invention applies to both the expanded and non-expanded products. (DX-2, p. 125-26; PX-32).

102. The Court holds that defendant's "unclean hands" defense is not supported by the evidence.

103. Defendant contends that the patent in suit is invalid because certain terms such as "cooling", "relative temperature" and "surface coating" are indefinite. The record shows, however, that these are common, well known terms in this field, and one skilled in the art has no trouble in understanding them and practicing the patented invention. (Mohlie Tr. 51, 55-56, 58, 61, 65-73; Harris Tr. 483-85).

## II. Infringement Issues

104. When defendant's president first became aware of Gravy Train, he urged his vice-president of production to develop a similar gravy-type product for defendant to market. Defendant was aware of plaintiff's Gravy Train before it started to develop its Gravy Style product. (Stip. 35; Kassens Tr. 1117, 1123.)

105. The commercial success of Gravy Train was recognized by defendant's president in his decision to market a gravy-type dog food. Defendant called the gravy-type product the "fastest growing segment in the dog food section today." The success of Gravy Train also led Ralston to market gravy-type products. (Ingraham Tr. 1409-13; Kassens Tr. 1119; PX-14; PX-43B; Kassens dep. p. 39-41.)

106. Defendant decided to formulate a gravy type product in 1960. Defendant examined and tested plaintiff's Gravy Train product and all its characteristics. It studied plaintiff's bag for Gravy Train and noted the ingredients. In defendant's development program for Gravy Style, reference was made in its reports to the Gravy Train product. (Stip. 34, 36). In developing Gravy Style, defendant's experimenters eventually produced a kib with more expansion than its Vets' Nuggets product, and which contained molasses, also not present in Vets' Nuggets. (Smith Tr. 1251-53) Gravy Style also was coated with more fat than was used for Vets' Nuggets, and the very same gravy former (CMC) that plaintiff employs in Gravy Train was anchored in the fat coating. (Smith Tr. 1253-55).

107. In developing Vets' Gravy Style defendant experimented with various gums as thickening agents, but it finally settled on plaintiff's thick gravy concept and selected the preferred gravy former specifically mentioned in the claims of the patent in suit. (CMC). It selected CMC because as Mr. Smith, Vice President in charge of production for Perk at that time conceded, "it decided to stay with something that apparently had been proven." (Smith Tr. 1254-56). The gravy forming material on the surface of defendant's product is available for rapid hydration on addition of water. (Stip. 40; PX-43A, Engstrom dep. p.

20; PX–1, col. 10, lines 17–18 (claim 13); PX–43A, Engstrom dep. p. 97–107.)

108. It is significant that the Vets' Gravy Style package bears the identical chemical analysis as plaintiff's Gravy Train package, and defendant's advertising continually emphasizes the importance of the rapid gravy forming feature. (Kassens Tr. 1127–31; DX–89; PX–13; PX–28.)

109. Defendant admits that it practices the first several steps of claim 1 (PX–15; PX–16; Harris Tr. 452–53), but it contends that it does not perform the step of "cooling the dried product and coating its surface with a fat and dry gravy-forming and thickening material capable of "rapid reconstitution in water, the relative temperature of said dried product and coating fat being such that the fat forms a surface coating when applied to said dried product."

110. Defendant does cool its Gravy Style product at three locations after the product is dried to a stable moisture content.

(a) Defendant cools between exits of the first and second driers. PX–22 shows that the temperature of product issuing from the first drier at defendant's Camp Hill plant is 160–185° F. (p. 8.) The temperature of the product issuing from the second drier—which also acts as a cooler—is 120–155° F. (p. 16). The dried product is thus cooled as much as 40°, and defendant's witnesses admit that there is a 20–25° temperature drop in this step (PX–43G, Bathorn dep. p. 86; PX–43C Smith dep. pp. 381–82). At Kansas City the defendant operates its second drier with a circulating drying medium maintained 70–80° F. lower than that of the first drier (PX–19 shows temperature ranges from 240–250° in the first drier as opposed to 160–170° in the second drier.)

(b) Defendant cools during travel of the kib from the second drier exit to the fat applicator station. PX–20 and 21, which give hourly temperature recordings for defendant's plant currently in operation, show that there is an additional cooling of 5–20° F. in the product as it travels from the second drier exit to the station where it is sprayed with fat.

(c) Defendant blasts its product with cooling air immediately after spraying it with fat. PX–41B, a reduced copy of PX–41, shows a stipulated flow chart of defendant's process. At the end of the process there is depicted a cooler 25–50 feet in length which follows the fat application step. The product is blasted with air, cooled 50–60° in this cooler, and emerges from the cooler at around 90–100°.

111. The stated objective of the patent is to effect a cooling sufficient to limit surface penetration of fat and maximize its presence as a coating to serve as a carrier for the gravy former. (PX–1, col. 1, lines 57–63, col. 2, lines 19–25, 38–46, col. 5, lines 63–67.)

112. Defendant contends that "cooling" in accordance with the specifications and claims of the patent in suit requires; (1) that the temperature of the material treated be lowered to a level not higher than the congealing temperature of the fat to be applied, and (2) that said lowering take place before the fat is applied. Since defendant's product is not cooled to the congealing temperature prior to the application of fat and gravy former, and the process includes a step of drastic cooling immediately after the fat is applied, defendant contends that it does not infringe the cooling step.

113. Plaintiff was required to include the cooling step as a condition to the patent's allowance, since the Examiner raised the point that a surface coating of fat for anchoring the gravy former (as opposed to fat penetration) can be obtained only if the product is cooled. (DX–2, p. 51).

114. In support of its argument that the cooling step must precede fat coat-

ing, defendant cites the following specifications from the patent:

"The so dried particles may be cooled to *ambient temperatures* as by contact with a stream of cool air for a period of 3 to 5 minutes.

Preparation of the novel gravy forming product of this invention may be accomplished preferably when the so-dried particles are cool. Although the temperature of these particles may vary, as hereinafter noted, they will preferably be at about ambient temperature, preferably at 60° F.–80° F.

The preferred fats which may be employed in practice of this invention include those which are solid at ambient temperature, e. g. at 60° F.–80° F. and which may be rendered fluid when warm, e. g. at temperature of 110°–140° F. * * * " (DX–1, col. 4, lines 57–69)

* * * * * *

"During the coating the relative temperature of the farinaceous particles and the fat are controlled so that: (a) the fat is sufficiently fluid to be coated onto the particles and to form thereon a more-or-less continuous coating; (b) the fat penetrates only slightly into the interior of the particle and preferably forms a coating on the surface thereof; and (c) *the fat solidifies substantially entirely as it hits the particle of food.*

Because of the porous nature of the particles, the sprayed fat will penetrate the outer surface thereof, but because of the controlled temperatures of the particles and the fat, the latter will solidify before it has penetrated more than the layer immediately adjacent to the surface. Thus the interior of the particle will preferably be free of fat while the exterior portion may contain a solid layer thereon. * * * " (DX–1, col. 5, lines 15–30) (emphasis added)

115. However, the Court is convinced that the cooling step is integrally related to the coating step. The coating cannot occur without cooling quite close in time to the fat coating, for otherwise the fat spray will penetrate the kib. If the fat penetrates into the interior of the kib more than slightly, it is evidence that the cooling step as taught in the patent is not practiced. We think it would be unduly restrictive to hold that the cooling step must always precede coating, if infringement could be avoided by an alteration of the cooling step, while at the same time achieving the coating which enables the product to yield its novel results. In so holding, we do not imply that the "cooling" requirement is indefinite, or encompasses temperature drops which are and have been normal or inherent in ordinary plant operations. For cooling procedures of such scope would not have the effect of achieving a surface coating as called for by the patent. We hold that defendant's process includes a cooling step as taught by the patent in suit.

116. Defendant contends that it was occupied with spraying hot fat on a hot particle so that the fat may penetrate into the particle. Not only does its rapid after-cooling belie this objective, but its end product shows that little or no such penetration occurs. Examination of defendant's product shows that defendant achieves a fat coating as defined in the patent. These products were coated by defendant itself with a black dyed fat under normal production conditions, and they show a black surface coating on the product with only slight penetration of the black dyed fat. Such penetration as occurs is expressly referred to in the patent specification, which recognizes that fat will penetrate "slightly." (Mohlie Tr. 105–17; Harris Tr. 603–04; Rosner Tr. 1589–90; PX–36; DX–100A, & 100B; col. 2, lines 20–25.)

117. Defendant achieves on its Gravy Style kibs a "more or less continuous" fat coating as is recommended in the specification of the patent in suit. It does not obtain spotting as contended by defendant. Upon physical examination of the kibs carrying the black-dyed fat, prepared by defendant in its Kansas City plant, both defendant's and plain-

tiff's witnesses agreed the kibs were virtually coated with black dye. (Rosner Tr. 1589–91; Mohlie Tr. 109). And the Court believes after carefully examining the exhibits submitted, (DX–100A and 100B), that defendant obtains a surface coating as specified in the patent, on its product.

118. Accordingly, the court must agree with the opinion expressed by Mr. Mohlie—that the third stage cooling, which reduces the Gravy Style kib virtually to ambient temperature, comes so quickly upon the heels of the fat application, that it is an obvious attempt to achieve the end of the invention—a temperature relationship between kib and fat which will cause the fat to form a surface coating. (Mohlie Tr. 96–101; Harris Tr. 455–58; PX–43G, Bathorn dep. p. 107–109) Although in defendant's process, the temperature of the particles at the time of fat application is substantially higher than the congealing temperature of the fat applied, (Dunker Tr. 1440; PX–41A; PX–20; PX–21; PX–24), very shortly thereafter the temperature of the particle is lowered to the fat congealing temperature, (PX–41B; PX–43C, Bathorn dep. 63), thereby insuring the retention of a "surface coating."

119. The Court finds that the defendant's use of an infra-red heater prior to the transfer from the second drier to the fat sprayer, has neither more nor less effect on the product than the few degrees of cooling that it nullifies, and that it does not affect the issues herein.

120. The claims in suit recite the function of the fat coating as maintaining the gravy forming material on the kib surface available for rapid hydration and defendant stipulates it serves this function on Vets' Gravy Style (Stipulated Fact 40.) The gravy former dusted on by defendant is a combination of three thickeners specified in the patent: CMC, gelatinized starch and guar gum (Stipulated Fact 38.)

121. The claims also specify that the coating of fat and dry gravy former re-

tards rehydration of the kib. Defendant contends this does not occur in the case of Vets' Gravy Style, but the Court finds otherwise:

(a) The colored photographs of defendant's kibs rehydrated in fluorescent dyed water show that the Vets' Gravy Style kib (PX–39, 39B, and 39C) maintained relatively dry centers with most fluorescent dyed water remaining near the surface, whereas, after three minutes of rehydration, the fat coated non-gravy kib (PX–38) was almost completely saturated with fluorescent dyed water. The "inner portion" of the Gravy Style kib thus remained relatively dry and crunchy (Mohlie Tr. 407–08, 416–18).

(b) Plaintiff's expert, Harris, also tested specimens of defendant's kibs rehydrated in fluorescent dyed water. He recorded in his notebook (DX–110, Bates 0033 and 0051) that Vets' Gravy Style when rehydrated manifested a "marked fluorescent water jacket" (DX–110, Bates 0051). He observed that defendant's nongravy Vets' Nuggets kib had "no water jacket" and "marked fluorescence in a cross-section of the kib" on rehydration (DX–110, Bates 0051).

(c) The Court's observation of defendant's demonstration at trial was that Vets' Gravy Style retained a more solid center than Vets' Nuggets with equal rehydration time (Mohlie Tr. 153).

(d) Defendant's expert, Rosner, admitted Vets' Gravy Style underwent a lower percent rehydration than the same kib without the gravy former (Rosner Tr. 1484) and his notebook, (PX–44), so indicates in most recorded tests, (pages dated April 26, 1967, May 2, 1967 and May 5, 1967).

(e) Harris performed further rehydration tests showing that Vets' Gravy Style requires 12 minutes in all to absorb all the free water (DX–110, Experiments 34, 35, Bates 0034, Experiment 70, Bates 0055, 0058, 0059, and Experiment 77 (unnumbered)),

whereas the comparable elapsed time for non-gravy Vets' Nuggets was less than six minutes (Experiment 65, Bates 0080, Experiment 70, Bates 0055, 0058, 0059, and Experiment 77 (unnumbered)).

122. Since all of the steps of claim 1 are practiced by defendant, the Court concludes that defendant's process infringes claim 1.

123. Claim 12 is a product-by-process claim which refers to a product "produced in accordance with the method of claim 1". Because the defendant produces its Vets' Gravy Style product by a process which infringes claim 1, defendant's product also infringes claim 12.

124. Claim 6 also depends upon claim 1, but it adds the further qualification that the fat must be applied "by spraying" and the product must be "kept in motion during the coating process to continually expose fresh product surfaces to the fat." Defendant admits that it applies fat "by spraying" and that its product is "kept in motion during the coating process to continually expose fresh product surfaces to the fat" and therefore it infringes claim 6 also. (PX–25).

125. Claim 4 follows the basic pattern of claim 1 but it contains a number of further steps such as, weight ratio, moisture content, drying temperature, fat percentage, and weight percentage of dry gravy former. Defendant's process for producing Vets' Gravy Style infringes claim 4, as shown, *inter alia,* by the following evidence. Claim 4 requires a weight ratio of farinaceous grain material to proteinaceous material between 2.5:1 and 0.8:1, and the Vets' Gravy Style formulation has a ratio of about 1.5:1 (PX–15, p. 2). Claim 4 calls for the moisture content of the material to be reduced by 2–5% to a level of "about 23–29% at the point of discharge from the extruder. At Camp Hill, the moisture content of the material is about 24% prior to the extruder and is reduced 2–5% to a moisture content of 20–23% at the point of discharge from the extruder (PX–17, p. 6; U.S. Testing Report PX–118, p. 6—samples 11A under "Moisture"; U.S. Testing Report DX–119, p. 6—samples 10A under "Moisture"). At Kansas City, the moisture content of the material before extrusion is about 25% (PX–17, p. 3) while after extrusion it is 18–22% (PX–17 p. 6), a temperature drop within the claimed 2–5% to substantially the same range as the "about 23–29%" moisture content called for by claim 4. The expression "about" is entitled to latitude in characterizing extrudate moisture, which was not critical to distinction over the prior art. Union Oil Co. of California v. American Bituminals, 109 F.2d 140 (9 Cir. 1940); Aerovox Corporation v. Micamold Radio Corporation, 15 F.Supp. 279, 286 (S.D.N.Y.1936), rev. on other grounds 92 F.2d 45 (2 Cir. 1937), cert. den. 302 U.S. 767, 58 S.Ct. 481, 82 L.Ed. 596 (1938). Claim 4 also requires that the drying temperature be under 300°F., and this limitation is clearly met by defendant's process which has a maximum drying temperature of 250° F. (PX–119; U.S. Testing DX–119 p. 5—samples 12 and 13). Claim 4 requires that 1.5–4% by weight of fluid fat be added to the dried product. Although defendant contends that it adds about 5–6% fat (PX–15; DX–101B), plaintiff's expert conducted a series of tests on this product and established that it contained only 2½–3% added fat and thus came within the claimed range of 1.5–4% (Harris Tr. 602–3, 623–6). He proved that, although defendant may have sprayed 6% fat toward the uncoated kib, only 2½–3½% added fat ended up on the product, possibly due to process inefficiency (Harris Tr. 668). *This testimony stands uncontradicted in the record.* Claim 4 also calls for this added fat to be solid at temperatures of 60–80° F. and capable of being rendered fluid at 110° F. Defendant's fat has a melting point of about 90° which meets these claimed conditions (PX–43G, Bathorn dep. p. 63). Claim 4 states that 0.22–5% by weight of dry gravy former is added to the product. The formulation of Vets' Gravy Style shows that

.98% of gravy former is added, which admittedly falls within the claimed range (PX–15, pp. 2–3).

## CONCLUSIONS OF LAW

1. This is an action arising under the Patent Laws of the United States and this Court has jurisdiction of the subject matter and parties involved, 28 U.S.C. Section 1338.

2. Plaintiff General Foods Corporation has been the sole owner of U. S. Patent 3,119,691 continually since its issuance.

3. Plaintiff's patent 3,119,691 was duly and legally issued pursuant to the Patent Laws of the United States and complies with the statutory provisions thereof, including the requirements of clarity and completeness of disclosures and definiteness of claiming.

■ 4. The point of origin in every patent case is 35 U.S.C. Section 282:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on the party asserting it."

This presumption is " * * * not an idle gesture * * * and is not to be overthrown except by clear and cogent evidence." Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 777 (7th Cir. 1961). The party asserting invalidity " * * * has a heavy burden of establishing invalidity by clear and convincing evidence. * * " King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 876, 879 (7th Cir. 1966).

■ 5. The usual presumption of validity arising from the granting of the patent in suit is not disturbed by virtue of our above finding that the prior art basic dog food kib anticipated the basic kib utilized by plaintiff. That is because the use of a gravy former to retard rehydration, retain particle integrity, and avoid mushiness was in no way suggested, much less disclosed by any of the prior art, either that of record in the Patent Office, or the prior art dry dog food products not of record therein. That such prior art products were not disclosed to the Patent Examiner is not significant in view of the singular novelty of the patentable invention in suit. We conclude that the best and closest prior art was considered by the Patent Office during the examination of the application on which the patent in suit issued, except for the non-significant omission of the Vets' Nuggets, Kasco, and Purina Dog Chow products.

■ 6. In the present case, the presumption of validity is greatly strengthened because the invention in suit satisfied a long-felt need and achieved quick and relatively substantial commercial success. Mineral Separation, Limited v. Hyde, 242 U.S. 261, 270, 37 S.Ct. 82, 61 L.Ed. 286 (1916); Eibel Process Company v. Minnesota & Ontario Paper, 261 U.S. 45, 46, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Ekco Products Co. v. Chicago Metallic Manufacturing Co., 321 F.2d 550, 553 (7th Cir. 1963), cert. den. 375 U.S. 970, 84 S.Ct. 490, 11 L.Ed.2d 418; P & D Sales & Mfg. Co. v. Winter, 334 F.2d 830, 835 (7th Cir. 1964).

■ 7. The presumption of validity is further strengthened in this case because the inventors completely departed from the teachings of the prior art and proceeded in a contrary direction in order to achieve their objective. Mathieson Alkali Works, Inc. v. Coe, 69 App. D.C. 210, 99 F.2d 443, 447 (1938); United States v. Adams, 383 U.S. 39, 51–52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Davies v. Coe, 65 App.D.C. 345, 83 F.2d 602, 603 (1936); In re Sutton, 211 F.2d 582, 587, 41 CCPA 816 (1954).

■ 8. The presumption of validity in this case is further strengthened by the fact that defendant imitated plaintiff's patented product after satisfying itself that the prior art was of no help to it. Shumaker v. Gem Manufacturing Co., 311 F.2d 273, 276 (7th Cir. 1962); Charles Peckat Mfg. Co. v. Jacobs, 178 F.2d 794, 801 (7th Cir. 1949), cert. den. 339 U.S. 915, 70 S.Ct. 575, 94 L.Ed. 1340; England v. Deere & Co.,

182 F.Supp. 133, 142 (S.D.Ill.1960) aff'd. 284 F.2d 460 (7th Cir. 1960); Neff Instrument Corporation v. Cohu Electronics, Inc., 298 F.2d 82, 87 (9th Cir. 1961); Mott Corporation v. Sunflower Industries, Inc., 314 F.2d 872, 880 (10th Cir. 1963).

 9. The patent in suit defines the invention to one skilled in the art—it is sufficiently definite under 35 U.S.C. Sec. 112. Hazeltine Research, Inc., v. Dage Electric Company, Inc., 271 F.2d 218, 220 (7th Cir. 1959); Webster Loom Co. v. Higgins, 105 U.S. 580, 586–589, 26 L.Ed. 1177 (1882); United States v. Adams, 383 U.S. 39, 51, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 256 (7th Cir. 1960); Procter & Gamble Mfg. Co. v. Refining, Inc., 135 F.2d 900, 906 (4th Cir. 1943). In Procter & Gamble, the Court noted:

"There are many situations in the practice of the arts in which specific directions are properly omitted from the claims of patents because greater definition is either impracticable or is unnecessary to inform the art, and would serve only unduly to limit the scope of the invention or to invite evasion by those who desire wrongfully to misappropriate the substance of the invention."

 Some degree of functional language in the claims is always permissible, particularly when the invention extends to a number of variants or where the art is fully informed by such language. S. D. Warren Co. v. Nashua Gummed & Coated Paper Co., 205 F.2d 602, 605–606 (1st Cir. 1953); Procter & Gamble Mfg. Co. v. Refining, Inc., 135 F.2d 900, 906 (4th Cir. 1943); Rohm & Haas Company v. Roberts Chemicals, 245 F.2d 693, 697 (4th Cir. 1957); Briggs v. M & J Diesel Locomotive Filter Corp., 228 F.Supp. 26, 47–48 (N.D.Ill.1964), aff'd. 342 F.2d 573 (7th Cir. 1965).

 10. Defendant resorts to the exercise of hindsight in its contention that the invention is obvious, a procedure which has been held notoriously

misleading. Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Florence-Mayo Nuway Co. v. Hardy, 168 F.2d 778, 781 (4th Cir. 1948); AMP Incorporated v. Vaco Products Co., 280 F.2d 518, 520, 521 (7th Cir. 1960) cert. den., 364 U.S. 921, 81 S.Ct. 286, 5 L.Ed. 2d 260 (1960); Shumaker v. Gem Manufacturing Co., 311 F.2d 273, 276 (7th Cir. 1962); Aerosol Research Co. v. Scovill Mfg. Co., 137 USPQ 701, 723, (N.D. Ill.1963), modified 334 F.2d 751 (7th Cir. 1964); Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 662, 663 (N.D. Ill.1961); Elgen Manufacturing Corp. v. Ventfabrics, Inc., 207 F.Supp. 240, 251 (N.D.Ill.1962), aff'd. 314 F.2d 440 (7th Cir. 1963); Illinois Tool Works, Inc. v. Continental Can Co., Inc., 273 F.Supp. 94 N.D.Ill.1967).

 11. The process for making the basic kib utilized by plaintiff, and the kib itself, are deemed to be anticipated by the prior art dog food products represented by Purina Dog Chow, Vets' Nuggets, and Kasco. However, the method specified in the patent encompasses a total process including not only the process for making the kib itself, but also the process for spraying a co-acting fat coating and gravy former on the kib, which was not done by the prior art, and which was not an obvious advance over the prior art. Neither plaintiff's total process nor the novel dog food product made by that process were in prior public use. The Court, therefore, finds that defendant has not met its burden to establish invalidity by virtue of prior public use, and that plaintiff is entitled to an adjudication of validity as to all of its claims, save for claim 13, which is discussed supra at Finding of Fact 91, and infra, at Conclusion of Law 16. Defendant's defense of prior public use can only be met by evidence so cogent as to leave no reasonable doubt in the mind of the Court, a showing which was not made here.

 12. In order to constitute an anticipatory use, the alleged prior process must not only embody all the steps

of the patent in suit (which the processes relied upon in the present suit do not) but it must be readily ascertainable and certain without making extensive experiments. Balaban v. Polyfoto Corp., 47 F.Supp. 472, 478 (D.Del.1942); Acme Flexible Clasp Co. v. Cary Mfg. Co., 96 F. 344 (S.D.N.Y.1899) aff'd. 101 F. 269 2nd Cir. 1900); Springs Cotton Mills v. Hall Laboratories, 208 F.2d 500, 504 (4th Cir. 1953); Illinois Tool Works v. Continental Can Co., Inc., 273 F.Supp. 94 (N.D.Ill.1967); Catalin Corporation of America v. Catalazuli Manufacturing Co., Inc., 79 F.2d 593, 596 (2 Cir. 1935); Weller Mfg. Co. v. Wen Products, Inc., D.C., 121 F.Supp. 198.

■■■ 13. Plaintiff's product is found to have achieved substantial commercial success, which is attributable partially to its advertising and promotion expenditures, but primarily to the invention itself, which is found to have satisfied a long felt consumer want. Commercial success and the filling of a long felt want should guard against the temptation to read into the prior art the teachings of the invention in issue. Canaan Products Inc. v. Edward Don & Co., 273 F.Supp. 492 (N.D.Ill.1966).

■■■ 14. Defendant's charge of fraud on the Patent Office based upon its contention that plaintif failed to call pertinent prior art to attention of the Patent Office fails since the record shows that the Patent Office had before it similar or better art.

■■■ 15. Except insofar as claim 13 is concerned, the parent patent application for Gravy Train fully supports the claims of the patent in suit which was filed as a continuation-in-part application of the parent case. Plaintiff is entitled to the earlier filing date of the parent application. The test is what the parent application teaches the man skilled in the art, not whether it is a carbon copy or uses the precise phraseology of the continuation-in-part case. Whatever is equivalent or inherent should be regarded as part of the disclosure of the parent application. Additional explana-

tion of properties and functions in the continuation case is permitted. Emerson v. National Cylinder Gas Co., 146 F.Supp. 581, 588 (D.Mass.1956); Canaan Products, Inc. v. Edward Don & Co., 273 F. Supp. 492 (N.D.Ill.1966); Illinois Tool Works, Inc. v. Continental Can Co., Inc., 273 F.Supp. 94 (N.D.Ill.1967); Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 12–14, 54 S.Ct. 752, 78 L.Ed. 1453 (1934); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 880 (7th Cir. 1966); Talon, Inc. v. Union Slide Fastener, Inc., 266 F.2d 731, 734 (9th Cir. 1959).

■■ 16. Claim 13 of the patent in suit, which claims CMC as the preferred dry gravy forming agent to be used in the product, is invalid, since it does not find support in the parent application. Hence, it is anticipated by plaintiff's own use of CMC as the preferred gravy former in its manufacture and sale of Gravy Train more than one year prior to the date of the continuation-in-part application. Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942); Crane Packing Co. v. Spitfire Tool and Machine Co., Inc., 276 F.2d 271 (7th Cir. 1960); Benz v. Celeste Fur Dyeing & Dressing Corporation, 37 F.Supp. 895 (S.D.N.Y.1944), affirmed 156 F.2d 510 (2d Cir. 1946), cert. denied 329 U.S. 736, 67 S.Ct. 101, 91 L.Ed. 635; Application of Moreton, 312 F.2d 954, 958, 50 CCPA 948 (1963).

17. In holding plaintiff's patent a nonobvious advance over the prior art, this Court has specifically considered the tests of nonobviousness set forth in Graham v. John Deere Co., 383 U.S. 1, 86 S. Ct. 684, 15 L.Ed.2d 545 (1966), as recently interpreted by this Circuit in Gass v. Montgomery Ward & Co., 387 F.2d 129 (7th Cir. 1967).

■■■ 18. There is no file wrapper estoppel or other limitation in the claims or specification requiring this Court, in adjudicating infringement, to ignore defendant's rapid cooling after spraying on the liquid fat. Cooling was

merely inserted to set forth an operative process for obtaining a fat coating to anchor the gravy former, not to overcome prior art, and the Examiner did not require any limitation that all cooling must occur prior to fat application. American Photocopy Equipment Co. v. Rovico, Inc., 257 F.Supp. 192 (N.D.Ill.1966). The claims of the patent in suit are not limited in their order of cooling and coating with a fat and gravy former. Transposition of the varying steps, or varying the details of a process, as by adding a step or splitting one step into two does not avoid infringement where the processes are substantially identical or equivalent in terms of function, manner and result. Malignani v. Germania Electric Lamp Co., 169 F. 299, 301 (D.N.J.1909); Matrix Contrast Corp. v. Kellar, 34 F.2d 510, 512 (E.D.N.Y.1929); Hammerschlag Manuf'g. Co. v. Bancroft, 32 F. 585, 589 (N.D.Ill.1887); Procter & Gamble Mfg. Co. v. Refining, Inc., 135 F.2d 900, 909 (4th Cir. 1943); Matherson-Selig Co. v. Carl Gorr Color Gard, Inc., 154 USPQ 265, 276 (N.D.Ill.1967).

19. Defendant's installation of an infra-red heater, after the commencement of this suit, constitutes an immaterial process variation, and does not either avoid or contribute toward infringement. See Lever Bros. Co. v. Procter & Gamble, 139 F.2d 633, 643 (4th Cir. 1943).

20. Plaintiff's patent 3,119,691 is good and valid in law as to each of claims 1, 4, 6 and 12 thereof, and invalid as to claim 13. The subject matter of each of these claims except claim 13, is of an inventive and patentable character and is not anticipated by or obvious from the prior art.

21. Each of claims 1, 4, 6, and 12 of plaintiff's patent 3,119,691 is infringed by defendant in the manufacture of its Vets' Gravy Style product.

22. Defendant's charge that the patent was procured by a fraud on the Patent Office is groundless.

23. Plaintiff is entitled to a permanent injunction against further infringement of its patent by defendant, and all those controlled by it or in privity with it.

24. Plaintiff is entitled to an accounting for damages suffered by it as a result of defendant's infringement. Such damages, however, should not be trebled, for the Court finds that defendant did not infringe in a willful and wanton manner.

25. Costs herein are assessed against defendant.

26. While an award of attorneys' fees may be granted in an exceptional case, such an award is within the discretion of the trial Court. Title 35, U.S.C. Sec. 285; Blanc v. Spartan Tool Co., 168 F.2d 296 (7th Cir. 1948). Section 285 is remedial, not penal, and should be invoked only when vexatious and unjustified litigation is clearly shown. Phillips Petroleum Co. v. Esso Standard Oil Co., 91 F.Supp. 215 (D. Md.1950).

27. The Court does not find present such equitable consideration as to make it grossly unjust that the prevailing party be left to bear the burden of its own counsel fees. The demand for counsel fees is denied. Jacquard Knitting Mach. Co. v. Ordnance Gauge Co., 213 F. 2d 503 (3d Cir. 1954); Chem. Const. Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3d Cir. 1962); Binks Mfg. Co. v. Ransburg Corp., 281 F.2d 252 (7th Cir. 1960), cert. dis. 366 U.S. 211, 81 S. Ct. 1091, 6 L.Ed.2d 239.

28. Any Conclusion of Law entered herein which may be construed in whole or in part as a Finding of Fact shall be so deemed and treated, as if set forth under Findings of Fact herein.